UNITED STATES of America,
Appellee,

v.

Carlos GARCIA, Defendant–Appellant.

Docket No. 01–1086.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 30, 2001.

Decided: May 17, 2002.

Robert L. Moore, Hempstead, NY, for Defendant–Appellant.

Catherine W.H. So, Assistant United States Attorney (Alan Vinegrad, United States Attorney, Emily Berger, Assistant United States Attorney, on the brief), Brooklyn, NY, for Appellee.

Before: POOLER, KATZMANN, Circuit Judges, and HURD, District Judge.*

POOLER, Circuit Judge.

Carlos Garcia appeals from the February 9, 2001, judgment of the United States District Court for the Eastern District of New York (Carol B. Amon, *Judge* ) after a trial jury convicted him of one count of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii)(II), and 846, and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II). The district court sentenced Garcia principally to two concurrent terms of 120 months imprisonment. On appeal, Garcia challenges two of the court's evidentiary rulings. First, Garcia argues that the court erred in admitting evidence of Garcia's prior conviction for the sale of cocaine to show his knowledge or intent regarding the instant drug deal. Second, Garcia argues that the court erred in allowing the government informant to interpret a code in which he and Garcia allegedly spoke during a recorded phone conversation. We find that the district court abused its discretion in both admitting the prior conviction and allowing the testimony. Furthermore, we find that these errors were not harmless, and we vacate both of Garcia's convictions and remand for a new trial.

## BACKGROUND

We take the following facts from the testimony at trial. The police arrested Carlos Garcia and Diego Ceron in July 2000 after Ariel Toro Balcarcel[1], a drug dealer turned government informant and cooperating witness, allegedly purchased three kilograms of cocaine from Garcia. Because Toro Balcarcel's testimony formed the crux of the government's case against Garcia and Ceron, we discuss his background here in some detail. Toro Balcarcel has an extensive criminal history. Born in Argentina, Toro Balcarcel first entered the United States in July 1995 with the intent to work on his music career. He stayed only one month, finding no success, and returned to Argentina. In Argentina, Toro Balcarcel began working for Arturo Bueno, a known drug dealer and the head of a criminal organization. Toro Balcarcel returned to the United States in August of 1995, this time with the express purpose of distributing heroin. Shortly after his arrival, police arrested Toro Balcarcel in New York when they discovered him in an apartment containing approximately two kilograms of heroin. In addition, Toro Balcarcel possessed seven grams of heroin on his person. Toro Balcarcel pleaded guilty to one count of simple possession of heroin, and the court sentenced him to five months imprisonment, three years probation, and a $1,000 fine. Although Toro Balcarcel testified that he was not responsible for the two kilograms of heroin, he admitted that he was in the apartment because he was sup-

---

* The Honorable David N. Hurd of the United States District Court for the Northern District of New York, sitting by designation.

1. Ariel Toro Balcarcel testified that he has used many aliases. For purposes of this opinion, we refer to him as "Toro Balcarcel."

posed to distribute a different shipment of heroin.

Authorities released Toro Balcarcel from prison in January 1996. He did not want to pay the outstanding fine, and he wanted to see his family, so he returned to Argentina. Toro Balcarcel did not seek the permission of his probation officer before leaving the United States, and a warrant issued for his arrest. Beginning in late 1996, Toro Balcarcel worked in Argentina and Colombia in the trafficking end of the drug business. Specifically, Toro Balcarcel recruited and supervised the individuals who worked as couriers to smuggle cocaine and heroin out of South America and into various countries, including the United States. Toro Balcarcel testified that part of his responsibility was to ensure that the couriers swallowed all the balloons containing heroin that they could. Toro Balcarcel also testified that one of the couriers he supervised died when some of the balloons broke, but he denied any responsibility for this.

In November 1997, Toro Balcarcel used a false name and false passport to return to the United States to supervise the arriving couriers and to distribute heroin. In September 1998, police arrested Toro Balcarcel for possessing forged passports. Authorities detained him for two months and then deported him to Colombia. In December 1998, Toro Balcarcel again used a forged passport to illegally enter the United States for the purpose of distributing drugs.

On March 31, 1999, police arrested Toro Balcarcel for possession with intent to distribute heroin and conspiracy to distribute heroin after they found Toro Balcarcel with three kilograms of heroin. Toro Balcarcel admitted that when the police arrested him, he lied about his identity, knowledge, and involvement to the police, his lawyer, and the court. In fact, it was not until August or October 1999 that Toro Balcarcel's lawyer informed the court of Toro Balcarcel's true identity. Shortly after his arrest, Toro Balcarcel entered into a cooperation agreement with the federal government in which he agreed to plead guilty to the charge of conspiracy to distribute heroin and to cooperate in police investigations in exchange for a U.S.S.G. § 5K1.1 letter. In August 1999, the government released Toro Balcarcel on bail in order for him to cooperate, and they gave him money and a phone card.

Toro Balcarcel testified that he worked as a drug dealer because he wanted to live well. All of his trips into the United States, save the first one, were for the purpose of distributing drugs. All of his entries, save the first one, were illegal and involved using false names and false documents. Toro Balcarcel testified that he had used many aliases while working in the drug industry and that he lied to the police about his true identity on numerous occasions in order to avoid apprehension.

At the time of Garcia's trial, Toro Balcarcel had pleaded guilty and was awaiting sentencing. He testified that he understood he faced a statutory minimum of ten years imprisonment and a maximum of life in prison. He also knew the § 5K1.1 letter would allow the court to sentence him to less than ten years. Finally, Toro Balcarcel testified that his cooperation agreement covered every criminal act he committed between 1995 and 1999 and that he cooperated because he did not want to go to jail and did not want to be deported.

While he was cooperating with the government, Toro Balcarcel completed an asbestos trade program and began working in the asbestos industry. In approximately December of 1999, Toro Balcarcel started working on an asbestos job with Ceron, with whom he became friendly and began socializing. After several months, Toro

Balcarcel approached Ceron with a proposed drug deal. Toro Balcarcel volunteered that he had some friends interested in buying heroin, and Ceron attempted to find a drug supplier. After an initial failed effort to coordinate a transaction with another individual, Ceron connected Toro Balcarcel with Garcia, a supervisor on an asbestos removal project who worked with Ceron. According to Toro Balcarcel, Garcia did not deal in heroin, but Garcia offered to supply Toro Balcarcel with cocaine. Toro Balcarcel testified that he ordered ten kilograms of cocaine from Garcia. Throughout the negotiations, Ceron continued to act as an intermediary between Toro Balcarcel and Garcia and served as the primary person through whom Toro Balcarcel could contact Garcia.

On July 12, 2000, under police monitoring, Toro Balcarcel met Garcia and Ceron at Garcia's house. According to Toro Balcarcel, Garcia had only three of the ten kilograms of cocaine that he had requested, so they agreed that Garcia would provide the drugs in separate deliveries and that Toro Balcarcel would pay Garcia at the end. Toro Balcarcel did not explain why Garcia agreed to front drugs on a first time deal to someone with whom he had no history of dealing. The detectives monitoring Garcia's house did not observe a transfer, but when Toro Balcarcel met the police after he left Garcia's house, Toro Balcarcel produced from the trunk of his van a bag containing three kilograms of cocaine. After Toro Balcarcel left Garcia's house, the police arrested Garcia and Ceron on drug charges and searched the house pursuant to a warrant. The police did not find any cocaine, drug paraphernalia, or a substantial sum of money in the house or on either Garcia or Ceron.

As one of the main pieces of evidence at trial, the government offered the tape and transcript of a July 10, 2000, recorded phone conversation between Toro Balcarcel and Garcia. The evidence showed that on July 10, 2000, Toro Balcarcel telephoned Ceron, who handed the phone to Garcia, and Toro Balcarcel and Garcia had a short conversation. A plain reading of the transcript reflects a conversation between Toro Balcarcel and Garcia in which they discuss a potential asbestos project, including details such as the number and positions of the necessary employees, the required licenses and paperwork, and the expected payment. They also agreed to meet to discuss the project further. The substantive portion of the conversation follows: [2]

Ceron: Hello.

Toro Balcarcel: What's up?

Ceron: What's up?

Toro Balcarcel: All okay?

Ceron: You coming?

Toro Balcarcel: No, dude, I can't ... I can't get there on time, man.

Ceron: [unintelligible]

Toro Balcarcel: No, man, this is why I called him early to have a talk with him. Isn't he [ ] there?

Ceron: Yes.

Toro Balcarcel: Put Caliche on.[3]

Garcia: Aloha.

Toro Balcarcel: What's up, man?

Garcia: What's up?

Toro Balcarcel: Listen, man, I can't there on time because it's that I'm over on Roosevelt with my family and I ha-

**2.** In the taped conversation, Toro Balcarcel and Garcia spoke in Spanish. The transcript admitted into evidence was an English translation.

**3.** Toro Balcarcel later testified that Caliche is a nickname for Carlos.

ven't been able to [sic] because my insurance just expired and ... this is why I called you early, so we could meet. But listen, I just spoke to my friend and it's all right; he'll be here early on Wednesday. Ten (10:00) o'clock on the dot. You know?

Garcia: Yes.

Toro Balcarcel: The one from the company.

Garcia: Yes

Toro Balcarcel: So I told this to the man, that I had to have the ... the three (3) licences. You heard? The lead one, the state and the city. He asked me is [sic] the other guys also had the licenses and I told him yes, they had them, the group, the supervisor, the foreman and eight (8) people.

Garcia: Yes.

Toro Balcarcel: I thought that in general there would be no problem, but always having the three (3) licenses, obviously. With the corresponding dates. So all I need is for you to give me ...

Garcia: Well, all right ... everything is up to date. Everything.

Toro Balcarcel: So there won't be any problem?

Garcia: I'm going to speak later on with Javier; everyone is okay with it and the paperwork is complete. Perfect.

Toro Balcarcel: Of course, this is the important thing, so that ...

Garcia: No, no, because ... this is why I wanted to talk about this over there because ... you know that when you get in touch with these people then they [unintelligible] working with our stuff.

Toro Balcarcel: Of course, it's that I ... I'm ready.

Garcia: Everything has been discussed, I discussed everything, everything is paid out and we've checked everything out twenty-four (24) hours a day.

Toro Balcarcel: This is the important thing because ...

Garcia: [unintelligible]

Toro Balcarcel: I just gave my approval.

Garcia: Yes

Toro Balcarcel: So this is for you to know and we'd get together on Wednesday and have a personal talk ...

Garcia: Anyhow, if you want, later, meet up with Diego and all that ...

Toro Balcarcel: Yes

Garcia: ... and you discuss these things with a little more time and then we're all set, you know?

Toro Balcarcel: But anyway, I wanted to tell you that it's for sure, one hundred (100) percent.

Garcia: Because you know, I didn't do another errand because I was waiting for ... to see if we could talk a bit more.

Toro Balcarcel: No, this has been done, listen ...

Garcia: For ... for this ...

Toro Balcarcel: One hundred (100) percent.

Garcia: reason I ... I ... didn't want to go calling people, get everything set into place ... and then get told that you're not going to ...

Toro Balcarcel: No, no, no ...

Garcia: work because there's no money or because ...

Toro Balcarcel: You can relax because it's for sure, one hundred (100) percent. I called you early so we could personally meet. And I called you to your cellular several times.

Garcia: Well, man, if you knew ... I've been here in Queens and I was then in [unintelligible] ... doing several errands. But all right, you also know I have the entire day ahead.

Toro Balcarcel: But the important thing is that everything comes out okay.

Garcia: Tomorrow my doctor will [unintelligible] of everything because it's all up to date.

Toro Balcarcel: So then . . .

Garcia: You said?

Toro Balcarcel: Okay, no problem then.

Garcia: Are you going to be home later on?

Toro Balcarcel: Later . . . I'll be over at Diego's as soon as I finish these errands I'm making.

Garcia: Well, I'll wait another while here, then.

Toro Balcarcel: Oh, okay, so then I'll call you in a while and if you're there I'll drop over and . . . we'll talk a bit.

Garcia: Okay, man.

Toro Balcarcel: If not, anyway . . . well . . .

Garcia: No, try to come over . . .

Toro Balcarcel: you know.

Garcia: . . . try and come over because I'll be waiting for you.

Toro Balcarcel: But anyway. You know.

Garcia: Okay.

Toro Balcarcel: Ready.

Garcia: Okay.

Toro Balcarcel: Okay? I'll call later.

According to the government, the real topic of this conversation was a drug deal, and Garcia and Toro Balcarcel were speaking in a code using terms from the asbestos industry to arrange the drug trade. At the trial and over both defendants' objections, Toro Balcarcel testified to the "real" meaning of the conversation and interpreted the "code." Toro Balcarcel testified that he and Garcia spoke in code in order for Garcia to feel more at ease, and he deciphered words and phrases of the conversation, explaining what he meant and what he understood Garcia to mean.

The defendants objected to Toro Balcarcel's interpretation of the conversation as unnecessary, given the self-evident meaning of the conversation. Garcia maintained that the conversation was about the asbestos industry and a potential asbestos job. He pointed to the plain meaning of the conversation, the lack of evidence establishing a prior agreement between Toro Balcarcel and Garcia to use code, and the lack of any evidence indicating how Garcia, an actual asbestos supervisor, would have known that they were speaking in code about drugs. The court overruled the defense objections and admitted Toro Balcarcel's testimony, ruling that the witness was entitled to "some leeway to interpret the conversation."

Toro Balcarcel deciphered the code as follows: "my friend" meant the customer; "three licences" meant three kilograms of cocaine; "group" meant ten kilograms of cocaine; "supervisor," "foreman," and "eight more people" together meant ten kilograms of cocaine; "matching dates" meant good quality; "high end" meant drug supplier; "the paperwork is complete" meant the ten kilograms were ready and would be at the deal; reference to Garcia's activities at the "DEP" meant Garcia had confirmed that the ten kilograms were ready; references to being "on standby" and "contracts" meant they could conduct another drug deal in the future; and "doctor" meant the drug deal was ready. When the government inquired why Toro Balcarcel used a code in talking with Garcia, Toro Balcarcel answered "so that [Garcia] could be at ease that the deal was something sure and that there was nothing strange." On cross examination, Toro Balcarcel rejected the defense's suggestion that the words concerned an asbestos project and meant only

what they appeared to mean. Toro Balcarcel also testified about other conversations and meetings he had with the defendants to set up the transaction and about several social meetings. None of these other conversations involved drug code.

In addition to Toro Balcarcel's testimony interpreting the phone conversation, the government introduced evidence of Garcia's April 4, 1988, conviction[4] for the sale of a controlled substance in the fifth degree, in violation of N.Y. Penal Law § 220.39, in the First District Court of Nassau County, New York. This twelve-year-old conviction involved two grams of cocaine and is a Class D felony. At a pretrial conference and at trial, Garcia objected to the admission of his prior conviction on the grounds that it was not relevant to any permissible use under Fed. R.Evid. 404(b). The court overruled the objection and found that the prior conviction was admissible as a similar act to show knowledge and intent of the allegedly coded language Garcia used to negotiate the instant drug deal. At trial, the government admitted Garcia's certificate of conviction and portions of the state court plea allocution. The government did not present evidence of any other prior conviction.

In addition to Toro Balcarcel's testimony and the prior conviction, the government introduced the testimony of Detectives Pedro Crespo and John Lawlor and offered into evidence three kilograms of cocaine, along with the bag in which police recovered it. Neither Garcia nor Ceron testified or presented a defense, but they both cross-examined Toro Balcarcel about his extensive criminal history. Defense counsel focused on Toro Balcarcel's practice of lying to the police and other officials when it was necessary to advance his drug business or self-interests. The defense also elicited information about a car accident Toro Balcarcel caused in September 2000 when he was under the influence of alcohol. He admitted that he left the scene of the accident and may not have had a proper drivers' license. He also admitted that he lied to the doctor who treated him after the accident. Toro Balcarcel testified that although he reported the incident to Detective Crespo, he never was arrested for his involvement. Finally, the defense questioned both Toro Balcarcel's credibility and his ability to perceive and recollect by inquiring about Toro Balcarcel's history of psychiatric treatment and medication for mental health problems, some of which related to his "phobias" and "fear of death." The jury found Garcia guilty of both the conspiracy and substantive possession counts,[5] and the jury acquitted Ceron of all counts. The district court sentenced Garcia on February 2, 2001, to 120 months imprisonment, four years supervised release, and a $200 special assessment. Garcia now appeals his conviction.

## DISCUSSION

### I. Prior Conviction

Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the char-

4. The actual offense occurred on October 8, 1987. Garcia pleaded guilty on April 4, 1988, and the state court sentenced Garcia on June 3, 1988, to six months imprisonment, five years probation, and $340 restitution.

5. The indictment also contained a charge against Garcia for being a felon in possession of a firearm based on the police's discovery of a gun in Garcia's house during a post-arrest search. The court granted Garcia's pretrial motion to sever the gun possession count. After the trial on the drug charges, the court granted the government's motion to dismiss the firearm count.

acter of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

■■■ The Second Circuit evaluates Rule 404(b) evidence under an "inclusionary approach" and allows evidence "for any purpose other than to show a defendant's criminal propensity." *United States v. Pitre*, 960 F.2d 1112, 1118 (2d Cir.1992) (internal quotations omitted); *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999). Courts may admit evidence of prior bad acts if the evidence " 'is relevant to an issue at trial other than the defendant's character, and if the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice.' " *Tubol*, 191 F.3d at 95 (quoting *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir.1998)). To determine if the court properly admitted prior act evidence pursuant to Rule 404(b), we consider whether: (1) the prior act evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice;

and (4) the court administered an appropriate limiting instruction. *See Huddleston v. United States*, 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *Pitre*, 960 F.2d at 1119. "We review a district court's admission of similar act evidence for abuse of discretion." *Tubol*, 191 F.3d at 95. An abuse of discretion requires that "the district court acted arbitrarily and irrationally." *Pitre*, 960 F.2d at 1119.

The government argued before the district court that evidence of Garcia's prior conviction was admissible to establish that he knew the July 10 phone conversation was about a drug deal in which he and Toro Balcarcel intentionally spoke in code. The government argued that "[e]vidence of Garcia's earlier involvement in narcotics transactions is admissible under Rule 404(b) to rebut [Garcia's] assertion" that the July 10 telephone conversation was not about a drug transaction, and to show that he was "a knowing and intentional participant in the transaction that took place at his residence, rather than a mere bystander."

Garcia opposed the government's application, arguing that the prior conviction was so dissimilar to the instant offense that it offered no probative value in establishing Garcia's knowledge that the conversation was about drugs. The court overruled Garcia's objection. The court stated that it would admit the prior conviction as relevant to the narrow purpose of showing Garcia's knowledge of the code used in the July 10 phone conversation and the conversation's true topic.[6]

---

**6.** In making its initial determination after considering the pretrial arguments, the court ruled:

> Under those circumstances, it seems like to me that knowledge and intent—even based on what I heard about the tape and the defendant's position that the tape

doesn't show any knowing drug deal, it would be my preliminary indication to permit the government to prove that prior similar act, because I think under the *Huddleston* analysis, since knowledge and intent is in this case, it's being advanced for a proper purpose to show knowledge and intent,

Knowledge and intent are permissible purposes for which courts can admit evidence of prior acts. *See* Fed.R.Evid. 404(b). Furthermore, Garcia "squarely placed in issue" his knowledge and intent when he denied the existence of a drug transaction, disputed the topic of the July 10 conversation, and argued that he knew nothing about a code. *United States v. Martino*, 759 F.2d 998, 1004 (2d Cir.1985); *Pitre*, 960 F.2d at 1119–20. Therefore, the government offered the prior act evidence for the proper purpose of showing Garcia's knowledge of the drug transaction and its use of code.

Our inquiry does not end there, however, because the government still must establish the relevance of the evidence to the issue in dispute. The government may not invoke Rule 404(b) and proceed to offer, carte blanche, any prior act of the defendant in the same category of crime. The government must identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act. *See, e.g., Pitre*, 960 F.2d at 1118 (upholding admission of evidence of prior drug transactions involving the same parties to show "a relationship of trust between the parties and that 'they knew about transactions of this type'"); *United States v. Foster*, 939 F.2d 445, 455 (7th Cir.1991) (admitting

Rule 404(b) evidence of defendant's poems using slang and code for drugs as relevant to defendant's knowledge of drugs in the instant case because the poems "indicated, at a minimum, that [the defendant] was familiar with drug code words and, to a certain extent, narcotics trafficking, a familiarity that made it more probable that he knew that he was carrying illegal drugs"); *Martino*, 759 F.2d at 1005 ("Thus, the government in an effort to meet its burden of proof was certainly entitled to offer this prior similar act evidence to aid the jury in assessing [the defendant's] intentions during his presence on at least three separate occasions during ongoing drug transactions."); *cf. United States v. Louis*, 814 F.2d 852, 856 (2d Cir.1987) (upholding admission of similar act evidence of phone conversation using code to show knowledge that defendant was discussing drugs in current offense).

If the government cannot identify a similarity or some connection between the prior and current acts, then evidence of the prior act is not relevant to show knowledge and intent. *See, e.g., Tubol*, 191 F.3d at 96 (finding district court's decision to admit a prior act erroneous where there was "no proof that the hoax bomb and the Israeli bomb shared any characteristics beyond the word 'bomb' or that [the defen-

it's relevant as to the crime the defendant is on trial for, a conspiracy involving cocaine and possession with intent to distribute cocaine. The prior crime itself is distribution of cocaine.

I think it's obvious at any time a similar act is admitted it carries with it some danger of prejudice, but here, I think, it's far more probative on the issue of knowledge and intent than prejudicial, I assume that you would want me to admit it with a limiting instruction, which I will do.

The defendant again objected when the government offered the prior conviction into evidence at trial, and the court confirmed its earlier ruling:

I have considered this carefully and I understand your concerns, I think knowledge and intent is an issue, I think it's relevant to this jury's consideration whether in that particular conversation Mr. Garcia's previous experience with drugs, although a small amount, it's the distribution of the same drug that's at issue in this case. I think it's relevant to the assessment of his knowledge and intent in engaging in that conversation. It's being advanced for a proper purpose. I think it's relevant for the crime for which the defendant is on trial. I think under the circumstances, it's more probative than prejudicial.

dant] used them in similar ways"); *United States v. Gaviria,* 116 F.3d 1498, 1532 (D.C.Cir.1997) (per curiam) (upholding admission of a prior uncharged drug offense because it showed that the defendant had past dealings with the same people involved in the current charge and "show[ed] how the appellants used code words to discuss the purchase of heroin [in the prior offense], [and thus] the evidence shed light upon the defendants' use of code words in discussing the purchase of cocaine [in the current offense]"). Without a connection between the two acts, the prior act is not relevant or probative and is inadmissible.

█ In this case, the government did not establish that Garcia's prior drug conviction was meaningfully probative of Garcia's knowledge that the July 10 conversation with Toro Balcarcel concerned a drug deal or that Toro Balcarcel spoke in code. The only similarity between the two drug transactions, which twelve years separated, is that both involved cocaine. However, the 1988 conviction involved two grams of cocaine, while the 2000 offense involved between three and eleven kilograms of cocaine.[7] The government did not offer evidence of any other similarity or connection between the two transactions. There was no proffer that the earlier transaction used a code or involved the same people. Nothing in the certificate of disposition or the plea allocution suggest any similarity between the events beyond the word "cocaine." Nothing in the record explains how Garcia's participation in a minor drug sale twelve years earlier is any more than marginally probative of the fact that Garcia must have known that drug dealers

speak in code and must have known that the July 10, 2000, conversation was a coded conversation about a drug deal.

The length of time between the events and the substantial difference in quantities involved detract from any potential probative value of the prior conviction. *Cf.* Fed. R.Evid. 609(b) advisory committee notes (explaining that the rule governing the admission of prior convictions for impeachment purposes "intend[s] that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances," because "after ten years following a person's release from confinement (or from the date of his conviction) the probative value of the conviction with respect to that person's credibility [is] diminished to a point where it should no longer be admissible"). Moreover, the government offered and the court admitted the prior conviction as relevant for a very specific purpose—to show that Garcia knew that the taped phone conversation was about a coded drug transaction—but made no attempt to link the transaction on that basis. In addition, the district court acknowledged that evidence of Garcia's prior conviction carried "some danger of prejudice," further underscoring the error before us. Given the lack of any connection between the two offenses and the absence of any similarities relating to knowledge of the code, we find that the court abused its discretion in admitting Garcia's 1988 conviction as relevant to his knowledge and intent. In addition, we note that the risk of prejudice arising from the admission of the prior conviction clearly substantially

---

7. The exact amount of cocaine involved in the instant transaction is unclear. The indictment alleged 500 grams or more of cocaine. The government initially maintained that Garcia agreed to sell Toro Balcarcel 11 kilograms. Toro Balcarcel testified that he negotiated the purchase of 10 kilograms. The police recovered 3 kilograms. Whether this transaction involved 500 grams or 11 kilograms, it is an amount many times greater than 2 grams, so much so that the dissimilarity detracts from any probative value of the prior act evidence.

outweighed any marginal probative value of the evidence.

## II. Testimony about the Alleged Code

■■■ We long have recognized that drug dealers seldom negotiate the terms of their transactions with the same clarity as business persons engaged in legitimate transactions. "[D]rug dealers rarely speak openly about their trade; instead, they often engage in a so-called 'narcotics code.'" *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir.1995) (quoting *United States v. Sisca*, 503 F.2d 1337, 1343 (2d Cir.1974)); *United States v. Velasquez*, 271 F.3d 364, 372 (2d Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1382, 152 L.Ed.2d 373 (2002). Given the attempts of drug dealers to disguise the content of their discussions as legitimate subject matters, courts may allow witnesses to "decipher" the codes drug dealers use and testify to the true meaning of the conversations. Testimony about the meaning of alleged code is admissible as lay opinion testimony under Fed.R.Evid. 701, or as expert testimony under Fed.R.Evid. 702.

Fed.R.Evid. 701 stated at the time of Garcia's trial:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.[8]

Fed.R.Evid. 702 states, in relevant part, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion ...." In this case, the government did not present Toro Balcarcel as an expert, and it offered his testimony interpreting the conversation on the basis of his status as a participant. Thus, the court admitted Toro Balcarcel's testimony about the conversation and the code as a lay opinion pursuant to Fed. R.Evid. 701.[9] We review a district court's

---

8. The 2000 Amendments, incorporated into the 2001 version of Fed.R.Evid. 701, add a clause to the end of the rule to clarify the distinction between lay and expert testimony. *See* Fed.R.Evid. 701(c) (adding the requirement that opinion testimony by lay witnesses be limited to opinions "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). This addition does not substantively change Rule 701. Indeed, the amendment serves more to prohibit the inappropriate admission of expert opinion under Rule 701 than to change the substantive requirements of the admissibility of lay opinion. "Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed.R.Evid. 701 advisory committee notes (2000). "By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in

Fed.R.Civ.P. 26 and Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a layperson." *Id.* Thus, our Opinion applies equally to cases subject to the new Rule 701 as to the 2000 version, which governed the instant case.

9. To some extent, the language the government used in questioning Toro Balcarcel on direct examination suggests that it was offering his testimony as an expert opinion. For example, the government asked Toro Balcarcel, "In your past experience in drug dealing had you ever used codes before?" If Toro Balcarcel offered his opinion on the allegedly coded conversation and Garcia's knowledge based on his "past experience in drug dealing," his opinion was not based on his perception of the situation as a participant in it. In order to offer opinion testimony based on Toro Balcarcel's knowledge as a drug dealer, the government needed to qualify Toro Balcarcel as an expert and comply with all of the

decision to admit evidence for abuse of discretion. *See Tubol,* 191 F.3d at 95; *United States v. Rivera,* 971 F.2d 876, 885 (2d Cir.1992)..

■■■■■ As a preliminary matter, the government argues that Garcia's challenge is subject to plain error review because Garcia raised this objection to Toro Balcarcel's testimony for the first time on appeal. This is incorrect. Garcia's counsel objected to portions of Toro Balcarcel's testimony about the alleged code at trial. In addition, Ceron's counsel objected to the testimony numerous times at trial. We presume that the objection of a co-defendant is an objection for all defendants, and it is sufficient to preserve the issue for appeal. *See United States v. Dinome,* 86 F.3d 277, 282 & n. 4 (2d Cir.1996). Thus, Garcia's objection is properly preserved for our consideration. We discuss whether the disputed lay opinion testimony met each of Rule 701's requirements.

### A. Prong One: Personal Knowledge

■■■■■ Rule 701(a) states that a lay witness only may offer opinions that are "rationally based on [his or her] perception." "The rational-basis requirement 'is the familiar requirement of first-hand knowledge or observation.'" *United States v. Rea,* 958 F.2d 1206, 1215 (2d Cir.1992) (quoting Fed.R.Evid. 701 advisory committee notes on the 1972 proposed rules). Contrary to the government's assertion, this foundational requirement goes to the admissibility of evidence, not merely its weight, because a "witness *may not* testify to a matter unless evidence is introduced sufficient to support a finding that

the witness has personal knowledge of the matter." Fed.R.Evid. 602 (emphasis added). Of course, the proponent of *any* evidence, not just lay opinion testimony, must establish a proper foundation for the evidence before a court may admit it. *See Lurie v. Wittner,* 228 F.3d 113, 134 (2d Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1404, 149 L.Ed.2d 347 (2001) ("The requirement that a proper foundation be laid for the admission of evidence serves that purpose [of preventing the confusion of issues] among others, and is well established."); *see also* Fed.R.Evid. 402 (discussing the admissibility of relevant evidence); Fed.R.Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Fed.R.Evid. 701(a) (requiring that lay opinion testimony be "rationally based on the perception of the witness"); *see, e.g., United States v. Fuentes,* 563 F.2d 527, 532 (2d Cir.1977) (discussing the foundation necessary to admit tape recordings). Thus, a witness offering a lay opinion must base his opinion on his own personal knowledge, which must be established to the court and jury. "When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 ... because there is no way for the court to assess whether it is rationally based on the witness's perceptions ...." *Rea,* 958 F.2d at 1216.

■■■■■ In this case, Toro Balcarcel testified about what he meant when he said certain things and what he understood Garcia to mean by certain words. Clearly, Toro Balcarcel had personal knowledge of what he meant when he spoke to Garcia,

---

pretrial disclosure rules. *See United States v. Figueroa–Lopez,* 125 F.3d 1241, 1246 (9th Cir. 1997) (rejecting agent's testimony as a lay witness when "the Government instructed the witness to answer questions 'based upon your

training and experience'"). Because the government did not qualify Toro Balcarcel as an expert, any opinion testimony based on his expertise and knowledge as a drug dealer was improper.

and his status as a participant in the conversation is sufficient to demonstrate the basis of this opinion. *See United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir.1992) ("[The witness], as a participant in the conversations, had first hand knowledge of the conversations."); *see also United States v. Estrada*, 39 F.3d 772, 773 (7th Cir.1994) (per curiam) (holding that a participant in the conversation may testify as to his understanding of the conversation to satisfy Rule 701(a)'s requirement that the testimony be rationally based on the witness's perceptions). However, to the extent that Toro Balcarcel offered an opinion about what he understood Garcia to mean, he was indirectly offering his opinion about what Garcia knew. This evidence in itself is not impermissible. "[T]here is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others," *Rea*, 958 F.2d at 1215, provided that the proponent of the testimony first establishes a proper foundation.

The government did not lay a proper foundation explaining the basis for Toro Balcarcel's opinion of Garcia's knowledge. Toro Balcarcel explained *his* participation in the conversation, why *he* spoke in code, and what *he* meant by the code he used. However, Toro Balcarcel did not offer any explanation for how *Garcia* could know that they were speaking in code. For example, he did not testify that they had spoken in code before; he did not testify that the code he used was a common one; and he did not testify that Garcia and he had a prior agreement to speak in code or that they had discussed this possibility. This lack of foundation is crucial, especially considering Toro Balcarcel's testimony that he used terms from the asbestos industry as his code and that both Garcia and he worked in the asbestos industry. There existed a real possibility that Garcia believed they spoke about asbestos, not drugs.

■ Evidence of a preexisting agreement is not always necessary for a witness to testify about his use of coded language. In this case, however, where there is a logical, coherent conversation with a plain meaning, the government must establish some foundation to support Toro Balcarcel's testimony that the conversation was not what it appeared to be. The government needed to elicit some testimony explaining how Garcia would have known that they were speaking in code about drugs and not about an asbestos job. When a conversation has a legitimate purpose understandable to a lay person, testimony about a code without some evidence of prearrangement or some other foundation is inappropriate. Further emphasizing the lack of foundation for Toro Balcarcel's testimony is his inconsistency regarding whether he ever had attempted to work on an asbestos project with Garcia. Originally, Toro Balcarcel testified that he never had worked or tried to work on an asbestos project with Garcia. However, he later testified that he tried to solicit work on an asbestos project and requested Garcia to supervise him. Toro Balcarcel admitted that Garcia and he had discussed asbestos in the past. Thus, it is plausible that they were discussing an asbestos job in the July 10 phone conversation. Without establishing some foundation to explain the source of Toro Balcarcel's opinion on Garcia's knowledge of the code, the testimony concerning what Toro Balcarcel understood Garcia to mean was erroneous. Unless courts require the proponents of such testimony to lay a proper foundation concerning personal knowledge, every conversation could be interpreted as cod-

ed.[10] Because the government did not lay a foundation for Toro Balcarcel's testimony expressing his lay opinion of Garcia's knowledge and understanding, the court abused its discretion in allowing the testimony. We analyze whether this error was harmless in Section III below.

### B. Prong Two: Helpful to the Jury

The second prong of Rule 701 requires that the lay witness's opinion testimony be "helpful" to the jury in understanding the witness's testimony or determining a fact in issue. Fed.R.Evid. 701(b). In this case, the government did not establish a foundation for Toro Balcarcel's opinion testimony. Therefore, we need not decide whether the testimony met the helpfulness requirement of Rule 701. However, we offer a brief analysis of the conversation to provide guidance to the district court in the event of a retrial.

 The July 10 conversation between Garcia and Toro Balcarcel is relatively clear, understandable, and logical. On its face, it concerned a legitimate topic—a potential asbestos job. Both Toro Balcarcel and Garcia worked in the asbestos industry. They discussed an upcoming meeting, the licenses required to complete the job, and several of the necessary positions. Both Toro Balcarcel and Garcia speak clearly and in full sentences, and they use words that make sense contextually. On the surface, the conversation is not "confusing and disjointed," *Urlacher*, 979 F.2d at 939, it does not involve unusually short or cryptic statements for a casu-

al phone conversation, and it does not contain "sharp and abbreviated" language, "unfinished sentences," or "ambiguous references," *United States v. Aiello*, 864 F.2d 257, 265 (2d Cir.1988) (internal quotations omitted). In order to allow lay opinion testimony interpreting a facially coherent conversation such as this, the government would have to establish a foundation that called into question the apparent coherence of the conversation so that it no longer seemed clear, coherent, or legitimate. Without a foundation creating doubt about what seemed to be obvious, it is unlikely that opinion testimony would be helpful to the jury. Rather, the testimony then would serve to direct the jury what to conclude on a matter that it should decide in the first instance. *See Rea*, 958 F.2d at 1216 (rejecting lay opinion testimony that "does not help the jury but only tells it in conclusory fashion what it should find").

The apparent meaning of a conversation is not devoid of context, and the foundational testimony may provide a background that makes interpretative testimony helpful. This interaction between foundation and coherence can influence whether opinion testimony is helpful. A proper foundation may provide a framework through which a seemingly clear, coherent conversation becomes unclear so that the opinion testimony interpreting the conversation would be helpful to the jury. Determining the potential helpfulness of testimony is not a science, and the clarity of a conversation is not subject to a formulaic analysis. The trial court must

---

10. In fact, the government's theory appeared to be that anything and everything Garcia said to anyone around the time of his arrest referred to drugs, as is evidenced by their attempt to introduce a separate tape-recording reflecting a conversation between Garcia and another individual not involved in this case. The government argued that this conversation also contained a code and ad-

dressed this deal, although it admitted the "code" was different. The defense argued that the conversation was not in code and was about exactly what it appeared—Garcia's asbestos job and the efforts of his union representative to help him with the criminal case against him. The court properly rejected the tape as not relevant to anything and without foundation.

consider the facial clarity of the conversation, along with the foundational testimony, and determine whether the conversation would benefit from opinion testimony. As is true of the admissibility of all evidence, the trial court must act within its discretion in determining the degree of coherence of a conversation and the helpfulness of opinion testimony.

## III. Harmless Error

▆▆▆▆ The court abused its discretion in admitting Garcia's prior drug conviction and Toro Balcarcel's testimony interpreting the July 10 phone conversation. Nonetheless, we will vacate Garcia's convictions only if the erroneous admission affected his substantial rights. *See Rea,* 958 F.2d at 1220. "An erroneous ruling on the admissibility of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *Id.* To determine whether the errors were harmless, we must consider the remaining evidence against Garcia.

▆▆▆ Without Garcia's prior conviction and Toro Balcarcel's testimony interpreting the allegedly coded phone conversation, the government still introduced some evidence consistent with a guilty verdict. First, the government introduced the three kilograms of cocaine that police recovered from the back of Toro Balcarcel's van and that Toro Balcarcel claims Garcia gave to him. This is the strongest evidence against Garcia. In addition, Toro Balcarcel testified that Ceron, Garcia, and he negotiated the drug deal, and he described the actual transaction. According to Toro Balcarcel, Garcia gave him the drugs. Finally, Detective Lawlor testified that during the police search of Garcia's house, he observed in the kitchen a rice bag similar to the rice bag packaging the three kilograms of cocaine. However, Lawlor also testified that, even though he recognized the bag in the kitchen as similar to the bag containing the cocaine, he did not seize it, he did not record it on any report, and he did not indicate prior to trial that he had observed it. He offered no explanation for his omission.

Although the existence of the three kilograms of cocaine presents powerful evidence consistent with Garcia's guilt, it is not dispositive. This alleged transaction involved three individuals—two defendants and a professional drug trafficker and distributor who was cooperating with the government. Garcia was not the only possible or logical source of the cocaine. While the transaction allegedly occurred on Garcia's property, it did not occur in his house. Toro Balcarcel, the only witness who connected Garcia to the drugs and who had been to Garcia's house before, had an extremely strong motive to assist the government. He was facing a sentence of ten years to life. Although the jury is entitled to credit his testimony, it is clear that they did not believe him entirely because they acquitted Ceron. Ceron, of course, is the individual who Toro Balcarcel testified initiated contact with Garcia, connected Toro Balcarcel and Garcia, and arranged the initial stages of the deal. The jury's acquittal of Ceron makes it less clear that they would have credited Toro Balcarcel's version of events absent the improperly admitted evidence.

The agents supervising the case did not observe Toro Balcarcel every minute. Before Toro Balcarcel arrived at Garcia's house, Toro Balcarcel met with agents Crespo, Lawlor, and Parton at a location approximately ten to fifteen minutes away from Garcia's house. At that location, the agents drew him a map, gave him a transmitter, and instructed him to open the trunk of his van to signal that the deal was complete. Toro Balcarcel denied that he

had any drugs with him when he left the meeting, but he did not testify that police searched him. Lawlor testified that Parton and he searched Toro Balcarcel and Toro Balcarcel's van and did not find any drugs. However, in the FBI report chronicling the events, Lawlor wrote only that Parton searched Toro Balcarcel and the van. He did not note that he had searched either Toro Balcarcel or his van. Further, on cross examination, Lawlor admitted that he did not observe Parton conduct either search. Parton did not testify.

Toro Balcarcel was alone and unobserved for ten to fifteen minutes from the time he left the meeting until Crespo, the agent observing Garcia's house, saw Toro Balcarcel arrive at Garcia's house. Crespo testified that he observed Toro Balcarcel arrive, he lost sight of Toro Balcarcel for several minutes, and then he observed the rear hatch of the van rise and lower and Toro Balcarcel driving away from Garcia's house. Neither Crespo nor any other agent observed Toro Balcarcel during the time of the actual transaction. No agent heard the transaction because the transmitter did not work properly and the agents did not equip Toro Balcarcel with a recording device.

Toro Balcarcel testified that he and Garcia were in "a room ... behind the driveway where there are tools" and that Garcia showed him the three kilograms and then put them inside two bags and gave the bag to Toro Balcarcel. No one observed this transfer. In addition, no one observed Toro Balcarcel place the bag with the drugs into his van, even though Crespo saw the trunk hatch go up and down. Thereafter, Toro Balcarcel was again alone and unobserved for approximately three minutes after he left Garcia's house. At this point, agents in cars followed him to the predetermined meeting location. During this ten to fifteen minute drive, Toro Balcarcel was alone in the van with agents following him. When Toro Balcarcel arrived at the predetermined location, he delivered the bag with the drugs to Lawlor.

Finally, we must consider the recorded phone conversation without the aid of Toro Balcarcel's testimony interpreting it. On the recording, Toro Balcarcel and Garcia speak about an asbestos project, using terms from the asbestos business. It is undisputed that both Toro Balcarcel and Garcia work in the asbestos removal business. Toro Balcarcel admitted that he spoke with Garcia about actual asbestos work in the past. The conversation has a legitimate plain meaning.

Toro Balcarcel's testimony about the conversation and the meaning of its coded words was central to the government's case and was the principal evidence against Garcia. The government offered the interpretation to explain the terms and setup of the drug deal. Further, the court's admission of Garcia's prior conviction was clearly prejudicial. It portrayed Garcia as a convicted felon and a repeat drug dealer. There was circumstantial evidence tying the drugs to Garcia; however, the court allowed the government to inappropriately introduce evidence of the earlier conviction and Toro Balcarcel's interpretation of the code. We cannot separate the effects of the improperly admitted evidence. We cannot satisfactorily tie the three kilograms to Garcia or state with any certainty that the prejudicial and erroneously admitted evidence did not affect the jury. The admission of Toro Balcarcel's testimony was not harmless error because we cannot "conclude that the testimony was 'unimportant in relation to everything else the jury considered on the issue in question, as is revealed in the record.'" *Rea*, 958 F.2d at 1220 (quoting *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884,

114 L.Ed.2d 432 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)); *United States v. Dicker*, 853 F.2d 1103, 1110–11 (3d Cir.1988) (finding reversible error in the erroneous admission of Rule 701 testimony about a conversation). The evidence in this case was largely circumstantial and not so overwhelming to allow us to conclude that the jury would have found Garcia guilty without considering the prior conviction and testimony interpreting the conversation. Therefore, we find that the errors were not harmless, and we vacate Garcia's convictions.

## CONCLUSION

The court erred in allowing the admission of Garcia's prior conviction as similar act evidence under Rule 404(b) because the prior conviction did not relate to Garcia's knowledge of the code allegedly used in the current offense or the use of codes generally in drug transactions. In addition, the court erred in allowing Toro Balcarcel to offer his lay opinion interpreting the July 10, 2000, conversation without the necessary foundation under Rule 701. Because these errors were not harmless, we vacate Garcia's convictions and remand the case for a new trial.