Bergan, J.
Appellants have been convicted of conspiracy to commit extortion and to fix prices; of carrying and possession of explosive substances and, in addition, appellant Colascione has been convicted of extortion and coercion. Severe sentences have been imposed.
*67 The theory of the prosecution was that in order to coerce some dissenting barbers to join a barbers’ guild in Nassau County which intended to fix minimum prices, defendants joined into a conspiracy to dynamite two specific barber shops, each defendant playing some effective role in the planning and execution of the purposes of the conspiracy and the plan being that the defendants Hagewood were imported from Michigan to do the actual dynamiting.
The trial was very long and complicated. It occupied almost four months. A large number of legal errors are assigned on appeal by defendants, each adopting most of the arguments of the others and adding them to his own, but only one appellant, Vito, argues the record is insufficient in law to sustain a conviction.
Three grounds are considered by the court to be of sufficient gravity to require a new trial: (a) an ex parte inquiry directed by the Judge to the jury concerning a purported prejudicial statement claimed to have been made in their presence; (b) the receipt of hearsay evidence on substantial issues in the case; (c) the acceptance of proof of a plea of guilty by a codefendant under instructions to the jury which permitted an inference the plea could be binding on appellants as coconspirators.
A fourth ground, the invalidity of the eavesdropping orders pursuant to which the police overheard and recorded meetings charged to be in furtherance of the conspiracy, is considered error by a minority of this court, but is not so regarded by the majority on the view that no invasion of privacy was involved.
The main frame of the People’s case is the testimony of Bob Meyer, described by the People as a “ confederate ’ ’ and ‘ ‘ key witness ”. At one point in the record there is extensive cross-examination of Meyer as to where he and his family had been staying during the trial. Among other things, he had stated, “ I don’t wish to divulge that right now ”. There were long colloquies on this subject, including whether the District Attorney had arranged for a place for Meyer to stay. At this point a luncheon recess was taken.
The record shows that immediately after the recess a motion for a mistrial was made by defendants based on an incident purported to have occurred after the Judge had left the bench. Somebody had told the Judge that Mr. Lewis, an assistant dis *68 trict attorney, said to defendants’ lawyers, possibly in the presence of some jurors, “You can call off your triggermen now, we have two cars of detectives going up to take care of Meyer’s family The relevancy of this to the inquiry which had been going on immediately before recess concerning where Meyer was staying is apparent.
The Judge stated that “ Word was conveyed to me by the clerk ” and that he had made inquiry from the District Attorney. There was further discussion during which Mr. Lewis conceded he made the remark, but had made it to Mr. Edstrom (one of counsel) “ in a very low voice ” and “ I believe ” after the jury had left the box. He “ repeated it” to the rest of counsel and, he noted, “that’s when the commotion started”.
Mr. Blake (one of defense counsel) told the Judge that he asked Mr. Lewis if he did not realize “ the jury is still here ” because “ there were eight of them standing right here ”. And Mr. Lamb (also one of defense counsel) told the court he “ tried to get Mr. Lewis’s attention to the fact that the jurymen had not left the box at this point ”.
It is obvious that this kind of a statement, following immediately upon attempts by counsel to find out where Meyer was staying—that the witness’ family was being protected from counsel’s “ triggermen ” — would have been prejudicial if heard by some or any of the jurymen.
The Judge was told by three of the lawyers that what* was said was loud enough and in the presence of enough jurors to be heard by some'of them. The Judge told counsel “ I am getting all of the facts on it ”. It is not clear whether he meant he was getting the facts at that time by the statements of counsel as to what had happened or through his previous inquiry made by the clerk. Since he did nothing more, he probably referred to what counsel could then tell. him.
This is all the record discloses about the scope and procedure of the Judge’s inquiry: “ I directed the clerk to ask the jury one specific question. ” The question was: “ Did they hear any remark passing between counsel after the Court adjourned for the luncheon recess and, specifically, did they hear anything Mr. Lewis said.” The Judge: “ And, the jury unanimously said no. So that settles the matter for the record and the motion is denied. ’ ’
*69 It would be a departure from traditional procedure for a Judge himself ex parte and in camera to ask this kind of a question against the possible prejudice to a fair trial, even though a record were made of exactly what he said and exactly what the jurors replied. But when a Judge sends an official emissary, representing him and apparently making inquiry on the announced authority of the Judge, to ask this kind of a question with no record made as to just what he said or just what answer he got, the record presents almost insuperable obstacles to appellate review and leaves quite open the possibility that appellants have been prejudiced.
Having made this ex parte direction without knowledge of counsel, the duty of the Judge on the motion for mistrial seems clear. He should have conducted an inquiry on the record and under oath from counsel or other nonjurors who could have heard what had been said and from the clerk as to the facts of his questioning. This should have been adversary in nature and have permitted cross-examination and the calling of any witness who could testify to relevant events.
As a result of such an adversary inquiry it could have been determined as a fact, in a form in which it could be adequately reviewed, whether or not the jury heard what was said. This might possibly have been determined without questioning the jurors themselves. But it might well have developed on such an inquiry that the only adequate way to decide this motion would be to question the jurors and, if so, it would have to be faced up to, with counsel taking such measures as they deemed right to protect themselves. The unilateral inquiry into an event which could well prejudice the rights of defendants to a fair trial runs against the tradition of the jury system.
Cases arising from communication between court and jury not following orthodox procedure differ greatly, as it would be expected, from case to case. The facts in the present case are probably sui generis. Yet the decisions make it clear that extraordinary precautions are taken to avoid possibility of prejudice to a defendant on the consideration of the merits of his case by the jury.
It would not be supposed, if the matter were one of first impression, that the personal absence of defendant when additional instructions are given the jury, and when his counsel is *70 present and makes no objection to this procedure, could possibly make any real difference. But, beginning with Maurer v. People (43 N. Y. 1 [1870]) it has been the rule that the absence of defendant during additional instructions was fatal to the verdict. Judge Grover reasoned that if the defendant had been present when the jury came in at midnight for further instructions on dates shown by the testimony (p. 2) defendant might have done what his counsel did not do — call attention to other parts of the testimony (p. 5).
And, although this was limited somewhat in People v. Bragle (88 N. Y. 585), the general rule has been consistently followed. See, for example, the meticulous adherence to the rule in 1961 by the court in People ex rel. Bartlam v. Murphy (9 N Y 2d 550) where a new habeas corpus hearing was directed on the mere allegation of relator in his papers (not factually supported by him at the first hearing) that he and his counsel had been absent when further instructions were given to the jury and the trial minutes did not show anything about this one way or another.
At the Appellate Division in People v. Jelke (284 App. Div. 211) the examination by the Judge of two jurors on their qualifications and a conversation between the Judge and one of the jurors (recorded) as to doubts in the juror’s mind as to his impartiality were regarded as “ serious error [s] ” (p. 218), but an additional ground was the only one reached by this court (People v. Jelke, 308 N. Y. 56).
In People v. O’Keefe (306 N. Y. 619) the Judge held a private conversation with a juror, who had been accepted but before the selection of the jury had been completed, about her disinterestedness in response to an affidavit furnished by the People. This was fully disclosed by the Judge to counsel and they were allowed, if they wished, to excuse that juror without loss of a challenge. Neither defendant nor the People made any challenge nor excused her and the juror sat. There was an exhaustive examination of the problem at the Appellate Division by Justice Halpern, who concluded defendants had not been prejudiced in view of the .opportunity that had been left open to them to excuse the juror.
But here, opportunity to act was withdrawn from counsel. There was no contemporaneous record of what the clerk had said to the jurors, of what they had said to him, and of what report *71 was actually made to the Judge. In this situation appellants have demonstrated a sufficient basis for a new trial.
There are two areas in the trial in which the admission of hearsay evidence must be deemed to have prejudiced defendants. The more serious of these is the rather extensive evidence of John Foy, a special agent in the Intelligence Division, Internal Revenue Service, who testified over objection to conversations he had with State officers which were based on what had been told him by Meyer, and which, in effect, reconstructed the conspiracy as the People contended it had occurred.
Mr. Foy testified that he went to the Nassau District Attorney’s office and talked to Captain Schuchman. “ I told him a little bit about what we had ”. He then saw District Attorney Cahn. “ I repeated a little bit of the story to Mr. Cahn ”. Then he talked to Mr. Levy, an assistant district attorney. He was then asked the question: “ Tell us what you said.” There was strenuous objection in sequence by all counsel which was overruled.
Mr. Blake (one of counsel) asked the court: “ Did I hear you right? Are you going to let this witness testify as to conversations he had with Mr. Levy not in the presence of the defendants? Is that the purport of your ruling, your Honor? ” Nevertheless, the court received the narrative of what Mr. Foy told Mr. Levy. Mr. Foy conceded on cross-examination that ‘ ‘ everything ’ ’ he had told the District Attorney he ‘ ‘ got ’ ’ from “ my informant, Bob Meyer ”.
He testified on direct examination: “ I told Mr. Levy that two barber shops in Nassau County were going to be blown up either late that night or early the next morning. * * * I told him that two torchmen were coming in from the Midwest to do this job and that they were driving a 1955 or 1956 Buick with a license plate—with a No. 7336 Michigan. But at that time I did not know the two letters on the license plate. * * * I told him that I would endeavor to find out the full license plate number and a further identification. I did give Mr. Levy an identification of the two men. * * * I said to him that the two men were slim built, apparently Italian, that one had a moustache. They were about average size, one a little bit taller than the other. That was all I knew at that time, and that as soon as I got further information that I would let him know.” *72 This kind of a narrative of what ohe man said to another tnan, that had been told by a third man, was not admissible ih a criminal trial against any of these defendants (5 Wigmore, Evidence [3d ed.], §§ 1361, 1362; Richardson, Evidence [7th ed.], § 246). Tills rule of exclusion has been uniformly honored. Many cases illustrate one or another aspect of it (see, e.g., Waldele v. New York Cent. & H. R. R. R. Co., 95 N. Y. 274; People v. Seppi, 221 N. Y. 62; People v. Trowbridge, 305 N. Y. 471; People v. Cioffi, 1 N Y 2d 70).
The Deople pursue the lather novel argument in this court that “ Foy was reflecting to the court and the jury what his senses perceived at the time he had tke conversation with Assistant District Attorney Levy ”. Stich a sense perception was not a material fact in issue on the guilt of defendants and thus the reception of the hearsay was erroneous.
tiut it is suggested by the People that, eveti if it was error, it Was not harmful since this is substantially what Meyer later testified to when he was an accomplice witness. The truth of Meyer’s testimony, the backbone of the People’s case, ivas thus sought to be bolstered befóle the jury by the narrative of a government officer offered in a form which could be taken by the jury as something he knew himself to be true ahd whs reporting officially to State officers. It is difficult to avoid the conclusion that it was prejudicial as well as erroneous atid that it sought to add the prestige of the government office! to accomplice testimony and to the prosecution’s theory of the case on a vital matter.
Another departure from the protection of the hearsay rule Was made as to defendants Hagewood. Long after tke con-piracy kad terminated, and while the present indictments were jpeflding, a conversation between the witness Louis Arcuri and defendant Vito Was received in evidence, the main thrust Of which seems to have been to connect the Eagewoods with the plan to dynamite the barbel shops.
Vito, of course, could incriminate himself and make admissions aááinst his own interest, but the testimony of Arctiri shows that what Vito was saving, largely exculpatory as to himself, was addressed to the Hagewoods and hot an admission against himself. Although the prosecutor stated that ‘ ‘ This is merely binding against Vito because this is Vito speaking to Mr. Arctiri ”, *73 it is clear that essentially wfiat was being offered was a hearsay statement as to the ffagewoofis
The subject opened with a question to Arcuri as to a conversation “ with Joe Vito in Mineóla about the dynamite and about the Hagewoods This was objected to as not binding on the Hagewoods “ after the fact and not in their presence ”. fhe prosecutor saifi it was offerefi as “ binding against Joe Vito ” anfi the Judge, overruling the objection, ruled “ On that basis it is acceptefi and the jury is admonished accordingly ’ ’.
But, as the questioning went on and as further and more specific objection was addressed to it, it appears that the proof was in fact aimed at the Hagewoods. phis was not incidental or casual. For example, this question was asked: “ Can you tell us what he [Vito] told you [Arcuri] about his conversations with the Hagewoods when he found out about the dynamite? ” To the objection by counsel for the Hagewoods, the court merely saifi “ Overruled ”. Then came a question which coulfi have no possible significance as an admission by Vito: “ What fiid Vito tell you about what the Hagewoods told him before they were arrested? ” This called for hearsay and it was prejudicial to the objecting defendants.
Angelo Fusco was a codefendant named in all counts of the indictment. He was called as a witness against appellants. The prosecutor asked him, over objection, whether he had entered a plea of guilty to one of the counts, and he answered that he had. He was askefi, over objection, whether he had received any promise as to sentence and he answered he had not.
Appellants cfie several decisions in which this was held to be error (e.g., People v. Edwards, 282 N. Y. 413; People v. Taylor, 2 A D 2d 977; People v. Harbor, 258 App. Div. 1082; People v. Louise, 242 App. Div. 471; People v. O’Regan, 221 App. Div. 331). The People concede that there are some cases this way, but the “ modern view ” would make this evidence admissible (e.g., People v. Ahmed, 20 N Y 2d 958; People v. Savvides, 1 N Y 2d 554) and suggest the rule be clarified.
The plea has no probative value as to the guilt of a codefendant, although it would be admissible on general grounds as to credibility of the witness himself. But such proof can be prejudicial unless the Judge makes it clear that the plea is not any proof of guilt of a defendant on trial.
*74 The court here left it open to the jury to find that if a conspiracy was found to have existed, Fusco’s plea might then be considered on all appellants’ guilt. This is the way the Judge instructed the jury on receiving the proof of Fusco’s plea: “ This means that he admits this, it constitutes an admission, but as such it is not binding on these defendants unless and until a conspiracy has been proven to your satisfaction beyond a reasonable doubt, and even in which case it can be considered when you consider the case against any of the defendants if you are so satisfied.”
A juror would reasonably take this to mean that if he found a conspiracy to have existed he might then, if “so satisfied ”, find Fusco’s plea ‘ ‘ binding on ’ ’ the appellants. The explanation with which the court received proof of the plea to which appellants objected was prejudicial.
Appellant Vito argues that the evidence against him is insufficient either prima facie or beyond reasonable doubt as a matter of law, and especially that no active participation in the conspiracy has been shown as to him and that at most he was a mere spectator to events.
Yet, if Meyer’s testimony is credited, Vito admitted to him December 5, 1962, after the arrests, that “this.thing” (the arrests) would not have happened if Colascione had not talked too much; that something had to be done for the Hagewoods since he (Vito) was responsible for them; and that he (Vito) had ‘ ‘ brought them here ’ ’.
There is also some corroboration for Meyer’s testimony of Vito’s participation in the guild affair and there is independent proof of his acquaintance with the Hagewoods. For example, Marian Chapin, a waitress at Martell’s Restaurant, testified that shortly before December 4 she had seen the Hagewoods get out of a car and had seen them talking with Vito and on December 3 had seen Vito, Colascione and the Hagewoods at a guild committee meeting at the restaurant.
Louis Arcuri, a friend of Vito’s, testified that shortly before the purported crime he had seen Vito at a bar with the Hagewoods and at a party for Colascione on December 2 at a restaurant. Arcuri also testified that Vito told him he had found out about the dynamite and the situation before the arrests of December 4 and he (Vito) told the Hagewoods not to do the *75 dynamiting. There is other evidence tending to connect Vito with the barbers’ guild activities and with knowledge of and furtherance of the plan charged by the People. The case against him is sufficient prima facie.
The judgments should be reversed and a new trial ordered.