**UNITED STATES of America,**
**Appellee,**

**v.**

**Gilberto EDWARDS, also known as Lorenzo, also known as Logan, also known as Darnell Johnson, Defendant–Appellant.**

**Docket No. 02–1441.**

United States Court of Appeals, Second Circuit.

Argued March 7, 2003.

Decided Aug. 28, 2003.

Barry E. Schulman, Brooklyn, New York (Deborah A. Santelmo, Law Office of Barry E. Schulman, Brooklyn, New York, of counsel), for Defendant–Appellant.

Catherine L. Youssef, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney, Peter A. Norling, Assistant United States Attorney, Eastern District of New York, Brooklyn, New York, of counsel), for Appellee.

Before: CARDAMONE, SACK, Circuit Judges, and PAULEY *, District Judge.

CARDAMONE, Circuit Judge.

A jury in the United States District Court for the Eastern District of New York convicted Gilberto Edwards (defendant or appellant) of conspiring to import more than five kilograms of cocaine into the United States. The trial was conducted before District Court Judge Nina Gershon who, in a judgment entered on July 22, 2002, sentenced defendant to 235 months of imprisonment.

The evidence at trial showed that defendant used several aliases, putting on one name and then another like a kabuki player changing masks during his performance. There are of course legitimate reasons to borrow another name rather than using one's own. Actors and those in the entertainment industry come to mind. Defendant had an innocent explanation, *i.e.,* to promote his music business. But, a person may also use a different name rather than their true one as a shield to prevent discovery of criminal activity. The latter reason is the one the government advanced and sought to prove in this case. Its proof on this and other issues in this appeal presents us with a difficult and close question.

## BACKGROUND

### A. *Arrest of Cooperating Witnesses Rivera and Thomas*

The instant charges against defendant stem from an attempt to import cocaine undertaken by two women, Angela Rivera and Tanya Thomas. Rivera was arrested on December 2, 1999 at John F. Kennedy International Airport (JFK) in New York, as she was trying to smuggle over five kilograms of cocaine from Haiti into this country. A customs inspector grew suspicious of her because she moved slowly and with obvious difficulty. A subsequent search revealed packages of white powder taped to her thighs and stomach. After the powder tested positive for cocaine, Rivera was arrested.

When interviewed by a customs agent, Rivera declared a woman named Tanya had recruited her on behalf of a man named Lorenzo, and had promised her $5,000 for bringing the cocaine from Haiti. She stated she had not been told who would be meeting her at the airport. Rivera then agreed to participate in a controlled delivery. Wearing a recording device and followed by customs agents, she left the terminal and was immediately approached outside by Tanya Thomas. The two women spoke briefly, and then Thomas went to make a phone call. When she

* Hon. William H. Pauley III, United States District Court Judge for the Southern District of New York, sitting by designation.

returned, the two women attempted to get a taxi. At that point, Thomas was also arrested and separated from Rivera.

Thomas was taken back into the terminal for an interview at which she stated that the organizer of Rivera's smuggling trip was a man named Lorenzo, whom she thought also used the name Darnell Johnson. She admitted involvement in the importation scheme and said she and Darnell Johnson had both been waiting for Rivera's arrival at the airport. Thomas then made a recorded telephone call to Johnson asking him to pick her and Rivera up outside the terminal. Johnson never showed up.

During the same interview, Thomas also related that Darnell Johnson frequently hired women to transport drugs, and that earlier that year, in March 1999, she too had traveled to Haiti on his behalf. Unlike Rivera, Thomas refused to go through with the criminal scheme after seeing how much cocaine she would have to carry. She also described two successful smuggling trips undertaken by her friend Temika Lofton in March and November of 1999. According to Thomas, Johnson paid Lofton $5,000 for the first trip and $7,000 for the second.

Both Rivera and Thomas later entered guilty pleas pursuant to cooperation agreements with the government.

### B. *Defendant's Arrest*

More than a year after Rivera and Thomas had been arrested and interrogated at JFK in New York, Edwards was arrested in Hanover County, Virginia. On December 13, 2000 a sheriff's deputy on patrol saw a BMW stopped at an intersection shortly before 2 a.m. Despite a green traffic light, the BMW did not move, and defendant, the only person in the car, was sitting in the driver's seat with his head slightly slumped. Because of these circumstances, the deputy pulled the BMW over and approached defendant. Defendant produced a driver's license in the name of Gilberto Edwards and a vehicle registration in the name of Darnell Johnson. Edwards explained that Johnson was his business associate and the owner of the BMW. Defendant later consented to a search of the car, which uncovered additional documents in Darnell Johnson's name, including a checkbook and a social security card. During the search, the deputy also found a handwritten note that, according to a narcotics expert, contained instructions for diluting or "cutting" cocaine.

When informed that Darnell Johnson was wanted on an outstanding warrant in New York in connection with a narcotics investigation—and because Johnson's description matched defendant's appearance—the deputy sheriff placed Edwards under arrest. He was later charged in a four-count indictment with conspiracy to import and to possess cocaine with intent to distribute and with the substantive counts of importation and possession with intent to distribute cocaine. We set out below the details of Edwards' trial.

### C. *Defendant's Trial*

#### 1. *Government's Case*

Rivera and Thomas were the primary prosecution witnesses at defendant's March 2001 trial. Both identified Edwards as the man they knew either as Lorenzo or Darnell Johnson. Rivera also testified about her recruitment by Thomas on Lorenzo's behalf in November 1999 and described her smuggling trip to Haiti. Specifically, she told the jury that she met defendant for the first time on November 27, 1999, the day of her departure, when he drove her and Thomas from Brooklyn to JFK. On the way to the airport, Rivera

stated, defendant instructed Thomas to buy three envelopes and place the money intended for his cocaine supplier inside. According to Rivera, Thomas helped tape two sealed envelopes to Rivera's legs and instructed Rivera to place the third envelope in her bag. In Haiti, a man named Paris met Rivera and took her to a hotel, where she stayed for a few days. On December 2, the day of her return to New York, Paris took her to the home of a man named Joe. There, Joe and Paris taped to Rivera's legs and stomach the cocaine bags that were later discovered by JFK customs inspectors.

Thomas testified that she first met defendant, whom she knew as Lorenzo, Logan, and Darnell Johnson, in a New York night club in February 1999, ten months before her arrest. Shortly after that meeting, defendant began soliciting her help in drug smuggling. Thomas referred him to Temika Lofton, who traveled to Haiti in March and November 1999 and successfully transported narcotics into the United States. On the November trip Thomas accompanied defendant to the airport to pick up Lofton and a woman named Tamisha. During the car ride from the airport, Lofton complained about pain from the drug packages taped to her legs, lifting her skirt to show the packages to Thomas.

Thomas described her own trip to Haiti in March 1999, including her meeting with defendant's local supplier, Joe, and her last minute decision to abandon the smuggling attempt because of the quantity of drugs she was asked to carry. She also testified to several other trips—to Virginia, Atlanta, and Miami—she had taken with defendant. In Miami, defendant again asked her to carry drugs to New York. When Thomas refused, defendant enlisted the help of another woman—whose name Thomas did not know—and she saw defendant tape the drugs to that woman's legs in preparation for her trip.

The witness admitted that in November 1999, at defendant's request, she approached Rivera and offered her $5,000–$7,000 for bringing cocaine from Haiti. She described the drive the three co-conspirators took to JFK in substantially the same terms as had Rivera. She further stated that, while Rivera was in Haiti, she and defendant traveled to Virginia, and that she returned to New York alone on December 1. The following day, Thomas testified, defendant called and asked her to come to JFK to meet him and "[her] friend." After Thomas and defendant met, Edwards rented a car at the airport and dropped her off at the terminal where she was supposed to wait for Rivera and where she was later arrested.

The customs agent that interviewed Rivera and Thomas on the day of their arrests described the interviews and the information given him by the two women. The deputy sheriff from Virginia testified regarding the circumstances of defendant's arrest, describing the search of his car and identifying the items seized.

Special Agent Vincent Williams of the Drug Enforcement Administration (DEA) also testified for the prosecution. Williams, who had attended college with defendant, stated that defendant telephoned him shortly after his arrest, in January 2001, and asked to meet him. Defendant visited Williams at the DEA's New York office and, according to Williams, inquired about the possibility of becoming a DEA informant. Edwards told Williams that he knew people involved in the "drug game" and had information about drug transactions in other states and other countries. He also mentioned that he had been recently arrested based on the false claims of "two young ladies," but denied all involvement in the charged con-

spiracy. During the visit, defendant wrote down for Williams the names he used in his music promotion business, Darnell Johnson and Lorenzo.

The government's documentary evidence included airline records showing that a passenger named Darnell Johnson flew from Norfolk, Virginia, to JFK on the date of Thomas and Rivera's arrests. To further corroborate Thomas' testimony, the prosecution presented the records of the airport car rental agency showing that Darnell Johnson rented a car on the same date, as well as telephone company records, reflecting that Darnell Johnson was the subscriber to the number Thomas called after her arrest. Over defendant's objection, the trial judge also admitted into evidence the note with the cocaine-cutting instructions, or "recipe," seized from defendant's car at the time of his arrest, as well as expert testimony explaining the document's content.

### 2. *Defense Case*

The defense case consisted primarily of defendant's own testimony and the testimony of Temika Lofton, Thomas' friend. Lofton recounted in her testimony that Thomas sometimes arranged for women to travel to Haiti to work as exotic dancers and admitted to having taken two such trips herself, one in March and one in November of 1999. She further testified that during the November trip, the man who usually arranged for her performances in Haiti, Joe, asked her to carry drugs back to New York and that she refused. Lofton admitted that she knew defendant and that she and Thomas had traveled with him to Atlanta and Virginia in 1999, but she maintained that defendant had nothing to do with the Haiti trips arranged by Thomas, and added that Thomas' present boyfriend, Gap, was a drug dealer.

Defendant testified that he met Thomas and Lofton in a night club, had been friendly with both of them, and had traveled with the two women to Atlanta and to Virginia Beach. Edwards denied having ever solicited Thomas to carry drugs. He also denied any involvement in Thomas and Rivera's cocaine smuggling efforts and declared that he had never seen Rivera before the trial. While not admitting to using the aliases of Lorenzo and Logan, Edwards explained that he did use the name Darnell Johnson to expand his legitimate record promotion business. In his summation, defendant's counsel challenged as unreliable Rivera's in-court identification of defendant as the man whom she knew as Lorenzo from her ride to the airport.

Defendant testified that on December 2, 1999, the day of Thomas and Rivera's arrests, Lofton called him in Virginia and asked him to meet Thomas at JFK and to give her a ride home. Defendant refused, but after arriving at JFK he ran into Thomas at the car rental agency, and when she asked him for a ride, he declined.

Edwards conceded he visited Agent Williams at the DEA office after his arrest and wrote down the names Lorenzo and Darnell Johnson during that visit. He insisted that he wrote those names down only because they were the ones he had seen listed in his indictment. His meeting with Williams, he stated, was prompted primarily by a night club altercation that involved his brother and by concern for his family's safety. With respect to the cocaine-cutting recipe, defendant declared he had never seen it prior to his trial, and stated he often let friends use his car.

### 3. *Juror Dismissal*

During the prosecution's case one of the jurors reported she thought she had seen one of the trial spectators at her son's day

care center. Based on her description, she appeared to be referring to defendant's brother. Although the juror assured the district judge that she could remain impartial, she also stated she was concerned about what could happen after the trial and that she feared for her own and her son's safety.

After questioning her, the district court permitted defendant's attorneys to question defendant's brother. Although he denied having been near the day care center, the court dismissed the juror and replaced her with an alternate. Explaining the decision, Judge Gershon said the juror was "visibly trembling and frightened, not only for herself but for her son" and in the judge's view could not "sit fairly in this case."

### 4. *Verdict and Post–Verdict Proceedings*

The jury convicted defendant of conspiracy to import cocaine, acquitting him of the remaining three charges. Edwards was sentenced in July 2002 to 235 months of imprisonment, five years of supervised release, and a $100 special assessment. This appeal followed.

### DISCUSSION

Edwards raises four issues on appeal. He contends: (1) several of the trial judge's evidentiary rulings were an abuse of discretion; (2) he was denied due process because the prosecutor's comments during summation unfairly prejudiced him; (3) his Sixth Amendment right to counsel was violated; and (4) it was an abuse of discretion for the trial court to dismiss a juror during trial. We discuss each of these issues in order.

### I Evidentiary Rulings Under Rule 404(b)

■ On appeal, defendant urges primarily that the trial judge improperly allowed the jury to consider character or propensity evidence inadmissible under Rule 404(b) of the Federal Rules of Evidence. Rule 404(b) provides, in pertinent part, that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Fed.R.Evid. 404(b). We have adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's "criminal propensity." *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir.2002) (quoting *United States v. Pitre*, 960 F.2d 1112, 1118 (2d Cir.1992)). To determine if the trial court properly admitted other act evidence, we consider whether: (1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice; and (4) the trial court administered an appropriate limiting instruction. *Pitre*, 960 F.2d at 1119. We review the district court's rulings for abuse of discretion. *Garcia*, 291 F.3d at 136.

### A. *Cocaine–Cutting Recipe*

Defendant first challenges the admission into evidence of the note with the cocaine-cutting recipe found in his car when he was arrested.

### 1. *Evidence of Identity, Knowledge and Intent*

■ The government urges the recipe was properly admitted because it bore on defendant's identity and his knowledge and

intent with respect to the charged conspiracy. We think the recipe was permissible evidence of defendant's mental state, although it could not properly have been received on the issue of defendant's identity.

Knowledge, intent and identity are all expressly listed in Rule 404(b) as permissible purposes for offering other acts into proof. Further, appellant contested all three of these issues by challenging Rivera's in-court identification of him, denying any knowledge of Rivera and Thomas' cocaine importation scheme, and asserting innocent reasons for his association with Thomas and for his presence at the airport on the day of her arrest.

■ But simply because the defense has put these matters in issue does not open the door for the government and give it *carte blanche* to introduce any prior act of defendant that falls into the same crime category. *See Garcia*, 291 F.3d at 137. Rather, some similarity or tangible connection between the acts must be identified, something that makes the prior act relevant to proving the contested fact. For example, in *United States v. Zackson*, 12 F.3d 1178 (2d Cir.1993), proof that defendant had previously engaged in a marijuana transaction with a co-conspirator was highly probative of his intent to "enter another drug conspiracy with the *same co-conspirator*," and to rebut his defense that the association with that person was an innocent one. *Id.* at 1182 (emphasis added); *see also Pitre*, 960 F.2d at 1117–20 (upholding admission of evidence of prior narcotics transactions involving the same co-conspirators as the crimes charged).

■ Absent such pertinent similarities or connections between the two acts, however, other act evidence is not relevant and should not be received in evidence. *Garcia*, 291 F.3d at 137. For example, in *Garcia*, the prosecution's evidence included a taped telephone conversation between the defendant and a cooperating witness, both of whom worked in the asbestos industry. Although the conversation appeared to concern a potential asbestos project, the government argued that it was in fact a coded negotiation of a drug deal. To show defendant's knowledge of the alleged code, the government was permitted by the district court to introduce at trial defendant's 12–year–old state court conviction for selling two grams of cocaine. *Id.* at 131–35.

On appeal, we ruled the admission of the prior conviction an abuse of discretion. *Id.* at 130. The only similarity between the two drug transactions was that both involved cocaine. *Id.* at 138. There was no proof that the prior transaction was negotiated in code or that it involved the same conspirators. In the absence of such substantive connections, we held defendant's participation in a minor drug sale 12 years earlier was not meaningfully probative to demonstrate that drug dealers communicate in code and that defendant must have known the taped conversation was a coded conversation regarding a drug deal. *Id.*

■ The cocaine-cutting recipe in this case was factually connected to the charged crimes through two details, the underlying drug and the name Darnell Johnson. The more obvious connection is that both the recipe and the charges against defendant related to cocaine trade. Under *Garcia*, however, this connection standing alone does not establish the recipe's relevance and admissibility.

The second connection—the association of both the recipe and the charged crimes with the name Darnell Johnson—presents a more difficult question. As noted, defendant conceded his use of the name Darnell Johnson, and the only disputed identity issue was the accuracy of Rivera's in-court

identification of him. On that issue, however, the recipe was not relevant. For a rational juror to conclude that the recipe supported Rivera's identification of defendant Edwards as Darnell Johnson, the juror would have had to reason, first, that the recipe showed defendant to be a cocaine dealer, and, second, that a cocaine dealer was more likely to participate in the Rivera–Thomas scheme than a person not otherwise involved in the cocaine trade. Such reasoning, of course, calls for the very propensity inference prohibited under Rule 404(b). Thus, the recipe was not properly received as proof of defendant's identity.

Nonetheless, the trial judge had discretion to admit this piece of proof on the issues of defendant's knowledge and intent. Appellant had emphasized in his own testimony that he used the alias Darnell Johnson solely to promote his legitimate record business activities. Doubtless, this emphasis was to refute Thomas' statement that she knew defendant as Darnell Johnson in the context of his hiring young women to transport illegal drugs, including Rivera's smuggling trip that was the focus of the trial. The fact that the cocaine-cutting recipe was found in defendant's car among documents bearing Darnell Johnson's name undermined defendant's testimony regarding the limited scope of his use of that alias. That, together with Thomas' testimony, made it more likely that defendant's interactions with Thomas involved drug trade and that defendant's presence at JFK on December 2, 1999 was connected with Rivera's smuggling attempt. In other words, the recipe suggests that at the time of his arrest defendant was using the Johnson alias for cocaine trade purposes—which, in turn, makes it more likely that his interactions with Thomas under the Johnson alias were also related to cocaine trade.

Although we agree that the recipe was relevant to the contested issues of defendant's knowledge and intent, we reiterate that the question of its ultimate admissibility was a close one. The recipe suggested that defendant was a cocaine dealer and thus created some danger of unfair prejudice to him. Moreover, its probative value was limited in light of the slim connections between the recipe and the charged crimes. Nevertheless, given defendant's repeated assertions that his use of the name Darnell Johnson was confined to legitimate business activities, we cannot say that the trial court's decision to admit the recipe, accompanied by a limiting instruction, was an abuse of its discretion.

### 2. *Harmless Error*

Even if we were to conclude that the cocaine-cutting recipe was admitted in error, we would not reverse defendant's conviction. A district court's erroneous decision to admit evidence at trial does not require reversal of the judgment if that error is harmless. *Garcia*, 291 F.3d at 143. An error in admitting evidence is harmless if "the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *Id.* (quoting *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir.1992)).

Here, the remaining evidence of defendant's guilt was overwhelming. As noted, both Thomas and Rivera identified defendant as the organizer of Rivera's smuggling attempt. Thomas also testified to several other drug transportation ventures organized by defendant, which shared many of the same details as the charged conspiracy. For example, they all involved young women hired to fly to New York carrying narcotics in packages taped to their bodies under their clothes. Further, Thomas' description of her trip to Haiti dovetailed with Rivera's description of her

own experiences there. These similarities between the prior, uncharged schemes and the charged conspiracy significantly undermined defendant's assertions of ignorance and innocent presence at JFK on the day of Rivera and Thomas' arrests.

Additionally, the customs agent who interviewed Rivera and Thomas on the day of their arrests testified that Rivera named the man she was working for as Lorenzo during her first interview, even before Thomas was arrested. The customs agent further stated that Thomas implicated Lorenzo, or Johnson, immediately after her arrest and before she had any opportunity to coordinate her story with Rivera. Moreover, the documentary proof of airline, car rental, and telephone records corroborated Thomas' testimony regarding the events of December 2, 1999.

In sum, given the overwhelming other evidence of defendant's guilt presented by the prosecution, we conclude that the cocaine-cutting recipe did not substantially affect the outcome of the trial. Thus, even if we were to decide that it was error to admit the recipe, the error would have been harmless and would not entitle defendant to a new trial.

### B. *Statements to Agent Williams*

■ Defendant next maintains his statements to DEA Agent Williams about knowing people in the drug trade were inadmissible under Rule 404(b). Because appellant did not raise this objection before the trial court, we review it for plain error. *See United States v. Vonn,* 535 U.S. 55, 58, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002). This standard gives us discretion to correct a forfeited trial error if that error was obvious or "plain," affected defendant's substantial rights, and "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton,* 535 U.S. 625, 631–32,

122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (quoting *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

Edwards' challenge to Agent Williams' testimony falls far short of this exacting standard. First, the testimony was only minimally, if at all, incriminating. Williams did not testify that defendant admitted to any crimes. Quite the contrary, the agent specifically noted that Edwards denied all involvement in the conspiracy with which he had been charged. Further, Williams' testimony that defendant knew people in the drug trade was consistent with Edwards' own trial testimony that Thomas' boyfriend "Gap" was a known drug dealer. Moreover, as discussed above, the other proof establishing appellant's guilt was substantial and persuasive. Thus, Agent Williams' testimony did not affect any substantial rights of the defendant and cannot be a basis for reversal of his conviction.

### C. *Cross–Examination Regarding Bond Violation*

■ Appellant contends that during his cross-examination the prosecutor should not have been permitted to elicit that the visit to Agent Williams violated the conditions of his bail bond. For several reasons we think eliciting this testimony was perfectly proper.

First, Edwards did not admit that he violated his bond. Acknowledging that he was required to notify Pretrial Services every time he left home, he insisted he always followed this rule. Although he admitted he did not specifically mention the DEA as his destination, defendant maintained that he told Pretrial Services that he was going "for an interview." Hence, any proof of a bond violation was equivocal at best.

Second, even if the jury were to conclude that defendant had violated his bail bond conditions, the testimony was admitted for a non-propensity purpose permissible under Rule 404(b)—namely, as evidence of defendant's state of mind after his arrest. The prosecutor sought to establish that, because defendant was conscious of his guilt, he was so desperate to find a way to avoid prosecution that he was willing to violate his bail bond conditions to talk to Williams.

Third, the trial judge administered an appropriate limiting instruction, emphasizing the restricted relevance of this testimony. Judge Gershon specifically instructed the jury to consider evidence of a bail bond violation, if any, only to the extent that it reflected defendant's state of mind at the time he visited Agent Williams. The judge further cautioned that, if the jurors were to decide defendant had violated his bond conditions, they "should not use that in any way to conclude that he had a propensity to do bad acts and therefore [was] guilty of the crimes ... charged." The instruction was again administered at the completion of the trial, as part of the final jury charge.

Fourth, the prejudicial effect, if any, of the cross-examination was extremely slight. The transgression that could be inferred from defendant's answers was incomparably less serious than the crimes charged against him. In sum, the challenged testimony was elicited for a proper purpose, was accompanied by a proper limiting instruction, and was highly unlikely to prejudice defendant. *Cf. Garcia*, 291 F.3d at 136 (instructing that in reviewing challenges under Rule 404(b), appellate courts should consider the purpose for which the contested evidence was offered, its probative value, the danger of unfair prejudice, and whether the trial court administered an appropriate limiting instruc-

tion). Therefore, the district court did not abuse its discretion by permitting it.

### D. *Use of Alias*

■ Appellant's final argument under Rule 404(b) is that the prosecution presented his use of the alias Darnell Johnson as misconduct showing his propensity to commit "bad acts." Again, because defendant did not raise this claim in the district court, we review it for plain error. *Cotton*, 535 U.S. at 631–32, 122 S.Ct. 1781.

We find no error, plain or otherwise, in the admission of the alias evidence, consisting primarily of documents in Darnell Johnson's name seized during defendant's arrest and of Agent Williams' testimony that defendant admitted he used that name during his visit to the DEA. Rivera testified that she knew defendant as Lorenzo, and Tanya Thomas testified that she knew him as Lorenzo, Logan and Darnell Johnson. Neither woman knew defendant as Gilberto Edwards, his real name. Thus, defendant's use of the Darnell Johnson alias was relevant to the prosecution's case-in-chief because, like Rivera and Thomas' in-court identifications, it showed that defendant was the man described by those two witnesses as the organizer of their smuggling scheme.

Further, the alias evidence did not prejudice defendant. Defendant admitted that he used the name Darnell Johnson and was allowed to explain his use of that name. Accordingly, even if the admission of the evidence were error, it could not have affected defendant's substantial rights and would not result in a reversal of the conviction. For these reasons, defendant's challenge to the alias evidence must be rejected.

### II Prosecutor's Summation

■ Next, defendant asserts the prosecutor's summation included impermissible

propensity arguments. Because defendant did not object to the summation at trial, we also review this claim for plain error. *Cotton*, 535 U.S. at 631–32, 122 S.Ct. 1781.

 "The government has broad latitude in the inferences it may reasonably suggest to the jury during summation." *Zackson*, 12 F.3d at 1183. Improper summation statements violate a defendant's due process rights only if they "cause substantial prejudice to the defendant." *Id.* Having reviewed the summation transcript in its entirety, we believe defendant's characterization of the prosecutor's remarks is quite wide of the mark. The government's arguments were either properly directed at witness credibility or fully consistent with Judge Gershon's rulings on purposes for which evidence was admitted.

For instance, with respect to the cocaine-cutting recipe, the prosecutor pointed out that defendant's testimony about other people's use of his car contradicted his prior statement to the deputy sheriff that everything in the car belonged to him and argued that the inconsistency undermined defendant's credibility. Further, because defendant had put his credibility in issue, the prosecutor's arguments portraying him as a liar were not improper. *Cf. United States v. Coriaty*, 300 F.3d 244, 255–56 (2d Cir.2002) (observing that it is generally not improper for the prosecutor to use "the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue").

 The only arguably improper remark in the summation was the prosecutor's observation that Agent Williams did not corroborate Edwards' trial testimony that he met with the agent solely out of concern for his family. As appellant correctly points out, when defense counsel tried to cross-examine Williams about defendant's expressions of such concern, the prosecutor objected and the objection was sustained. We do not think the prosecutor's comment on this issue was so prejudicial as to amount to a due process violation. Indeed, read in context, it may be construed simply as a general invitation for the jury to compare defendant's and Williams' accounts of their meeting. Hence, the government's summation provides no basis for disturbing defendant's conviction. *Cf. Coriaty*, 300 F.3d at 255 (observing that a defendant challenging conviction based on a prosecutor's summation comments "must point to egregious misconduct"); *Zackson*, 12 F.3d at 1183–84 (finding no prejudice to defendant from prosecutor's summation despite a troubling remark that could be read to suggest disregard for evidentiary rules).

### III Sixth Amendment Right to Counsel

 For his next attack on his conviction defendant declares that, because his meeting with Agent Williams occurred after his indictment and outside the presence of his attorney, his statements to Williams were obtained in violation of his Sixth Amendment right to counsel and should have been excluded. Although the Sixth Amendment issue was not raised in the district court, on appeal appellant has maintained that we should excuse this failure because the government did not give him sufficient notice of its intention to call Agent Williams as a witness. This contention is not supported by the record.

The government informed defendant's attorney of its intention to call Williams more than ten days before the commencement of the trial. At a conference before a magistrate judge a week later, however, defense counsel was still unprepared to make any suppression motions with respect to the DEA agent's testimony. The magistrate then gave defense counsel an additional day to decide whether to move

for suppression of the testimony. No suppression motion was filed. As this sequence of events demonstrates, defendant had sufficient notice of Williams' proposed testimony and ample opportunity to object to it on Sixth Amendment grounds. Because defendant failed to do so, we review the Sixth Amendment claim for plain error. *See Cotton,* 535 U.S. at 631–32, 122 S.Ct. 1781.

■■■■■ The Sixth Amendment right to counsel attaches "at the initiation of adversary judicial proceedings," such as arraignment or filing of an indictment. *United States v. Yousef,* 327 F.3d 56, 140 (2d Cir.2003) (per curiam) (quoting *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)); *United States v. Abdi,* 142 F.3d 566, 569 (2d Cir. 1998). Once the right has attached, statements elicited by the government outside the presence of a defendant's counsel are inadmissible in the government's case-in-chief unless accompanied by a valid waiver of this right. *Yousef,* 327 F.3d at 140; *Abdi,* 142 F.3d at 569.

■■■■■ A Sixth Amendment violation occurs, however, only if the government has taken an action "that was designed deliberately to elicit incriminating remarks." *United States v. Rosa,* 11 F.3d 315, 329 (2d Cir.1993). "[M]erely fortuitous receipt of incriminating statements," by contrast, does not implicate the Amendment's protections. *Id.* As we explained in *United States v. Stevens,* 83 F.3d 60 (2d Cir.1996) (per curiam), the Sixth Amendment protection extends to "situations that 'look' like government interrogations." *Id.* at 64. If a criminal defendant proceeds to make incriminating statements "without any prompting or questioning by [government] officers," his Sixth Amendment rights are not violated even if he had previously requested counsel. *Id.*

Nothing in the record in the instant case suggests that any government agent prompted defendant either to speak to Williams or to discuss with him any specific subject. To the contrary, it is undisputed that appellant approached Agent Williams on his own initiative and voluntarily. Nor is there any indication either in Williams' or appellant's description of the meeting that the agent attempted to elicit any information other than administrative details, such as case number, which would have enabled him to check the status of defendant's case. In short, the record fails to reveal a Sixth Amendment violation.

Additionally, as discussed in part I B. above, Agent Williams' testimony with respect to defendant's statements to him was only minimally prejudicial and, in light of other evidence presented at trial, did not affect defendant's substantial rights. Consequently, even if defendant's Sixth Amendment claim had merit, we would not vacate defendant's conviction on this ground.

### IV Juror Dismissal

■■■■■ Finally, appellant challenges as reversible error the district court's dismissal of the juror who believed she had seen a trial spectator at her son's day care center. We have repeatedly emphasized the wide discretion trial courts have in addressing the effects of third party contacts on jurors. *See United States v. Blume,* 967 F.2d 45, 47–48 (2d Cir.1992); *United States v. Ruggiero,* 928 F.2d 1289, 1300 (2d Cir.1991). In this context, we have noted that a trial judge, who observes the jurors daily, is in a much better position to assess their ability to perform their duties than an appellate court, which relies solely on a cold, printed record. *See United States v. Abrams,* 137 F.3d 704, 708 (2d Cir.1998) (per curiam).

In the case at hand, the trial record amply supports Judge Gershon's decision. The juror told the judge that she was "scared," that she was concerned about her own and her son's safety, and that she thought she might have to start taking her son to a different day care center. The district court judge also observed that the juror was "visibly trembling and frightened." Under these circumstances, therefore, the district court had discretion to conclude that, even if the juror did not actually see defendant's brother at the day care center, her subjective fear interfered with her ability to be fair, and the juror therefore had to be replaced. *Cf. Ruggiero*, 928 F.2d at 1300 (finding no abuse of discretion in trial judge's dismissal of juror who, after a threatening encounter, was too frightened to deliberate).

## CONCLUSION

Accordingly, for the foregoing reasons, the judgment of the district court is affirmed.