OPINION OF THE COURT
Deborah H. Karalunas, J.
This constitutes the court’s decision concerning the issue of third-party juror contact and the motion of plaintiff Jeremy Bohn for a new trial.
I. Background
On October 9, 2013, a six-person jury delivered a unanimous defense verdict in this matter after a 15-day trial. Immediately after the verdict, the jurors disclosed to the court that they believed they had been stalked throughout the course of their jury service. The jurors identified their stalker as a man who had watched the trial in the public gallery, taking notes on his laptop computer.
On October 10, 2013, the court questioned the identified man, Scott Greenspan, in open court with counsel for all parties present. The court described its prior conversation with the jury:
“THE COURT: Following the verdict, I went into the juror room, as I always do, to personally thank the jurors. I asked the jurors, as I always do, whether they had any questions at all.
“The first question the jurors asked me was whether they did a good job. The second question the jurors asked me was who was the individual who was stalking them throughout this trial. When I inquired of the jurors what did the person look like who was ‘stalking’ them, to use the juror’s word, they advised me that it was the individual who I had admonished — I don’t know that the jury used that word — during the course of the trial, the individual with the computer.
*305 “The jurors described for me their interactions with you, Mr. Greenspan. They used the word you were creepy, that you were very seedy, that you were in the elevator with them frequently, that you followed them to various places where they had lunch, identifying four restaurants; that you were waiting in the lobby of the court [house] and got into the elevator with them after lunch to ride up in the elevator with them.
“The conversation — they also stated that the conversation you described having with the jurors in the elevator was that you were asked who were you and whether you were a reporter, and your response was that, ‘I’m not supposed to talk with you.
I wish I could talk with you. I really wish I could talk with you.’ And you repeated that multiple times.
“One juror expressed a concern that you were videotaping them. You were the subject of conversation amongst the jury throughout the course of the trial. The jurors — one of the jurors observed that you were speaking with [defendant] Dan DeRose, [defendant] Mike Roumph, and [defense counsel] Mr. First out in the Columbus Circle area. That juror then told the rest of the jurors that she figured out who you were because you were speaking to those individuals.
“They described that you would follow them where they went to lunch, and at one point they ducked into a restaurant and observed out the window that you were panicking because you couldn’t see them.” (Tr of Oct. 10, 2013 at 7-9.)
On October 16, 2013 the court questioned one of the jurors in camera but on the record and under oath. The testimony of this juror confirmed the court’s summary of the conversation in the jury room immediately after the verdict. (Tr of Oct. 16, 2013 at 2-3, 7-9.) The juror in his/her own words described Mr. Greenspan’s conduct:
“THE WITNESS: He followed us everywhere. When we would go to lunch, he’d follow us to where we were going. One day we had an hour and 15 minutes, a little bit of extra time, so we walked down to Armory Square to Blue Tusk. And I told the other jurors, this guy is following us everywhere. So after the third time I saw him, I said look behind you, *306 that’s what I’d say to them, and he would always be there . . .
“But when we would go on the elevator, he would always be there. When we got outside, we would go to have a cigarette right out front, he’d always be standing close by. When we got back on the elevator to come up, he was always there.
“THE COURT: When you said he was there, he would get in the elevator with you?
“THE WITNESS: Yes. Every chance he got. And it bothered me. And one day I said to him, excuse me, are you a reporter. And he kept his head up and he said, I can’t talk to you, I’m not supposed to talk to you. It’s not that I don’t want to, I just can’t talk to you. I’m not supposed to. Meanwhile, the elevator stopped, we got out and we were walking back to the jury room. And that was the only speaking words that I had with him. But like I said, it bothered me, who are you and why are you doing this. . . .
“But the only times we did not see him out of that whole time was once we went to Ale and Angus and once we went over to The Mission and we didn’t see him there.
“THE COURT: So the other times he was everywhere you went?
“THE WITNESS: Yeah, where we went. And he was always pulling something similar to that, like a briefcase, it was a half of briefcase on a rolling thing. And I don’t know, he was creepy, you know. And he was always in the audience.
“So we didn’t know who he was. That’s why I asked him if he was a reporter because it was getting on my nerves, he was always there. We’d sit in Armory Square and just talk, he’d be right behind us.” (Tr of Oct. 16, 2013 at 3-6.)
The juror testified that he/she saw Mr. Greenspan speaking with defense counsel and defendants Michael Roumph and Daniel DeRose. (Tr of Oct. 16, 2013 at 5-8.) The juror also testified that he/she surmised from that observation that Mr. Greenspan “was working for them and he was typing everything just like a court reporter so that they would have the documents.” (Tr of Oct. 16, 2013 at 8.) The juror testified that he/she relayed this information to the rest of the jurors: “I told them I think I *307 got this figured out, I know who he is.” (Tr of Oct. 16, 2013 at 9.)
The juror testified that Mr. Greenspan was in the elevator with the jurors “[a]t least half the time, if not three quarters of the time.” (Tr of Oct. 16, 2013 at 9.) The Onondaga County Courthouse has four working elevators. The juror testified that he/she believed Mr. Greenspan was purposely trying to follow the jurors. (Id.) The juror testified that two fellow jurors believed that Mr. Greenspan was videotaping them. (Id. at 5.)
When the court asked the juror “How did this person make you feel?” the juror responded:
“THE WITNESS: Scared. I didn’t like it. It was creepy. Especially because he did follow us everywhere and we didn’t know who he was. I was very curious because I was sick and tired of him following us. And I said I’m going to ask him, if he’s got the nerve to follow us around, I’m going to have the nerve to ask him why. ... I just did not like it. He was everywhere we went. You know, to me that’s stalking. You don’t do that.” (Tr of Oct. 16, 2013 at 10-11.)
When questioned by the court on October 10, Scott Greenspan stated that he was a partner in a New York City law firm. (Tr of Oct. 10, 2013 at 3.) Mr. Greenspan testified that he is counsel for National Union Fire Insurance Company, which insures New Forba (i.e., FORBA Holdings, LLC), the individual dentist defendants and the defendant Syracuse Small Smiles dental clinic. (Id. at 3-4.) Mr. Greenspan stated that AIG Claims, Inc., the authorized claims handling representative of National Union, asked him to monitor the Bohn trial. (Id.)
Mr. Greenspan testified:
“I can tell you what my understanding was of my purpose. It was just to monitor the trial and report back to the client on my mental impressions as to what was going on. I have been a litigator for 18 years, and that was my purpose in reporting back to the client what was going on and whether there were any implications for the insurance coverage issue.” (Tr of Oct. 10, 2013 at 4-5.)
Mr. Greenspan acknowledged that one of the jurors asked him in the elevator whether he was a reporter, and Mr. Greenspan stated that his reply was “I’m sorry, but I can’t answer your question. No one can talk to the jury.” (Tr of Oct. 10, 2013 *308 at 6.) Mr. Greenspan stated that he shared an elevator with jurors two or three times total. (Id.) He testified that “one or two times” he ate in the same restaurant as the jurors. (Id.)
Mr. Greenspan testified that
“I have no client/attorney relationship with the Old Forba people. . . . They’re not clients. ... As far as my clients go, I had no instructions whatsoever to talk with the jury or have any interaction with the jury at all. I have been doing this for eighteen years. I’m [AV] rated with Martindale-Hubbell and no client would be worth interfering with a jury, so, you know . . . that’s my testimony.” (Tr of Oct. 10, 2013 at 9-10.)
The court invited all parties to submit papers in response to the October 10, 2013 proceeding involving Mr. Greenspan. On October 21, 2013, the court provided counsel with a transcript of the juror’s October 16 testimony and gave counsel additional time for their submissions. The October 16 transcript was redacted to conceal the juror’s identity, and the court instructed all counsel to have no contact with the jurors.
II. Discussion
A. Court Process
Trial courts have wide discretion in addressing the effects of third-party contacts on jurors. (United States v Edwards, 342 F3d 168, 182 [2d Cir 2003].) In Edwards, the Second Circuit endorsed the actions of a trial judge who interviewed a juror in camera after the juror reported that she had seen a trial spectator at her son’s day-care center. (Edwards, 342 F3d at 175-176, 183.)
In the matter at hand, the court spoke with jurors after they rendered their verdict and concluded their jury service. The jurors spontaneously inquired about the person who stalked them throughout the trial. In an abundance of caution, the court conducted on the record and under oath its in camera examination of the one juror who spoke with Mr. Greenspan. Counsel for all parties had the opportunity to witness the court’s examination of Mr. Greenspan. This process struck a balance between protecting the jurors and providing detailed information to the parties while also allowing the court to address the effect of Mr. Greenspan’s admitted contact with the jury.
According to defendants, the court engaged in impermissible ex parte communications. The cases defendants cite in support *309 of this assertion, however, have nothing to do with a court’s investigation of third-party contacts with jurors. The case People v Oliver (4 AD2d 28, 32 [3d Dept 1957]) involved an unrecorded sidebar conversation between the judge and a juror while the jury was being polled. The case People v Colascione (22 NY2d 65, 68-69 [1968]) involved an unrecorded inquiry between a court clerk and the jury about whether the jury heard a prejudicial remark by the prosecutor. In each case, obviously, the jurors were still serving or delivering their verdict.
Defendants also claim that the court’s conversations constitute “reversible error” (see e.g. Marangas aff of Oct. 25, 2013 ¶ 10), but do not indicate what proceeding or decision must be reversed. Instead, defendants argue that this court is now disqualified from ruling on plaintiff’s motion for a new trial because the court is a fact witness. As outlined above, case law dictates otherwise. Defendants’ preliminary objections are rejected.
B. Misconduct Concerning the Jury
Certain principles of our judicial system are inviolate. As the Fourth Department recognized in 1932:
“Every litigant is entitled to a fair and impartial trial before an unprejudiced and unbiased jury. A party should not be compelled to submit his rights to a tribunal whose honesty and impartiality can be questioned. The triers of the facts should be beyond suspicion. Otherwise the administration of justice will quickly fall into disrepute.” (Payne v Burke, 236 App Div 527, 528 [4th Dept 1932].)
When a court makes inquiry into the trial process, jurors’ own statements are incompetent to impeach their verdict. (Id. at 529.) In other words, a court will not invade the deliberative process even where there are allegations of misconduct in the jury room, and this was the central issue in Payne. (Id.) However, “[t]he general rule that a juror may not impeach his own verdict does not apply to instances of prejudicial conduct occurring outside of the jury room.” (Alford v Sventek, 73 AD2d 825, 825 [4th Dept 1979].) A common example of misconduct that occurs outside the jury room took place in Alford, where a juror made an unauthorized visit to the accident scene central to the trial. (Id.; see also Bainton v Board of Educ. of City of N.Y., 57 Misc 2d 140, 140 [App Term, 2d Dept 1968] [holding that jurors’ unauthorized visits to accident scene were “highly improper and so inherently prejudicial as to require a new trial”].)
*310 Beyond the question of misconduct is that of prejudice. “[Bjefore setting aside a verdict because of outside influences, the court must examine whether such outside influences were prejudicial and likely to influence the verdict.” (Alford, 73 AD2d at 825.) In Alford, the Fourth Department reasoned that no prejudice was likely based on the way a juror voted. Although the Court of Appeals affirmed, Judge Wachtler in dissent noted that the majority’s rationale essentially invaded the jury’s deliberative process: “the fact remains that we simply do not know precisely how or whether the jury used the information provided. In this situation the misconduct is presumed to be harmful.” (Alford v Sventek, 53 NY2d 743, 746 [1981, Wachtler, J., dissenting].)
Judge Wachtler relied on a 1911 case where jurors also made an unauthorized visit to a scene central to a civil trial (Adams Laundry Mach. Co. v Prunier, 74 Misc 529 [Sup Ct, Schenectady County 1911]). The court in Adams Laundry held that “[t]he misconduct being shown, the presumption is that it was harmful.” {Id. at 531.) Like the Fourth Department in Payne, the trial court in Adams Laundry declined to invade the jury’s deliberative process. It did so for the simple reason that
“it is the most natural thing for a juror who has innocently made such a mistake to explain that such a mistake has accomplished no wrong. . . . ‘Almost any juror, when detected in such misconduct and arraigned for it, will disclaim the influence upon his own mind of what he has uttered in violation of his duty.’ ” {Id. at 532-533.)
The proper inquiry concerning prejudice thus is whether the misconduct or improper outside influence was likely to influence the verdict. (Alford, 73 AD2d at 825, citing Payne v Burke, 236 App Div 527 [4th Dept 1932].) As the Fourth Department stated in Payne:
“It was not necessary for the plaintiff to show that the acts complained of influenced the verdict in favor of the defendants; it is sufficient to warrant relief, if they were likely so to do. It is important that the conduct of those to whom the administration of the law is intrusted should be such as to furnish no just ground for suspicion that the decision was founded on anything other than the evidence.” (Payne, 236 App Div at 528-529.)
Moreover, “where the court cannot determine, with any reason *311 able certainty, whether the result was affected or not... it will be assumed that it was.” {Adams Laundry, 74 Misc at 531.)
Case law presents a variety of potential outside influences on verdicts. As the Court of Appeals noted, “[improper influence, of course, embraces not merely corrupt attempts to affect the jury process, but even well-intentioned jury conduct which tends to put the jury in possession of evidence not introduced at trial.” {People v Brown, 48 NY2d 388, 393 [1979].)
The Fourth Department held that it was not likely that jurors who received cake and had their photographs taken during juror appreciation week allowed that outside influence to impact their verdict. (Hersh v Przydatek, 286 AD2d 984, 985 [4th Dept 2001].) Similarly, the Second Department found no likely influence where a judge and a juror had an ex parte conversation about the juror’s need to pick up his young children later in the day. (Snediker v County of Orange, 89 AD2d 560 [2d Dept 1982], affd 58 NY2d 647 [1982].) The Second Department found no prejudice when a juror expressed his condolences to trial counsel upon learning of the death of counsel’s mother. (Garcia v Brooklyn Hosp., 270 AD2d 386 [2d Dept 2000].) At the other end of the spectrum is a case in which a court attendant allegedly told a deliberating jury that they must continue deliberations until they reached a verdict. (Burtch v Shah, 230 AD2d 223 [4th Dept 1997].) A new trial was required. (Id. at 227.)
Just as trial courts have wide discretion in addressing the effects of third-party contacts on jurors, “[t]he decision to grant or deny a mistrial is within the sound discretion of the trial court and is to be made on a case-by-case basis.” {Chung v Shakur, 273 AD2d 340, 340 [2d Dept 2000].) “No ironclad rule concerning juror misconduct has been formulated, and we have observed that ‘[i]n each case the facts must be examined to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered.’ ” {Alford, 53 NY2d at 745, quoting People v Brown, 48 NY2d 388, 394 [1979].)
C. Findings
Upon proper examination of the facts, the court concludes that Mr. Greenspan made improper contact with the jury. Mr. Greenspan acknowledged his conversation with a juror in the elevator. Defendants would like the court to limit its inquiry to that conversation, arguing that the testimony between Mr. Greenspan and the juror is largely consistent and that the conversation was harmless. According to defendants, the *312 conversation becomes more innocuous because it was the juror who initiated the exchange.
What defendants ignore, however, is what prompted the juror to finally ask Mr. Greenspan who he was. In the juror’s own words:
“I was very curious because I was sick and tired of him following us. And I said I’m going to ask him, if he’s got the nerve to follow us around, I’m going to have the nerve to ask him why. ... I just did not like it. He was everywhere we went. You know, to me that’s stalking. You don’t do that.” (Tr of Oct. 16, 2013 at 10-11.)
The court credits the sworn testimony of the juror, a completely disinterested witness, and the consistent statements of the jurors given immediately after the verdict. The court finds that Mr. Greenspan’s conduct went well beyond the conversation in the elevator. Over the course of a 15-day trial, Mr. Greenspan continuously followed and monitored the jurors when they went to lunch, when they took smoking breaks, and when they rode the elevator. The court discredits Mr. Greenspan’s attempts to minimize his contacts with the jurors. Even without characterizing the behavior as stalking, Mr. Greenspan’s contact with the jurors constituted improper misconduct.
The court also finds that the misconduct was prejudicial and likely to influence the verdict. Defendants contend that if Mr. Greenspan’s conduct prejudiced any party, it would be them, because the jurors believed that their stalker was associated with defendants. According to defendants, if Mr. Greenspan’s conduct angered the jurors, then the jurors would punish who they believed Mr. Greenspan “worked for,” the defendants. However, the jury verdict for the defense is a stronger indication that the perceived intimidation was successful. The jurors perceived that a “creepy” man was following them, and one juror said he/she felt scared. The jury also believed that their stalker worked for defendants. By returning a verdict in favor of defendants, the jury could be assured that their stalker would be satisfied. Similarly, the jurors’ failure to alert the court to the existence of the stalker until after they delivered their verdict is consistent with a theory of intimidation and fear.
In a case such as this perceptions are critical. When the trial court discharged a juror in the Edwards case, the Second Circuit recognized that “the district court had discretion to conclude that, even if the juror did not actually see defendant’s brother *313 at the day care center, her subjective fear interfered with her ability to be fair.” (Edwards, 342 F3d at 183.) No court will be able to conclusively establish the effect of the perceived stalker on the jury’s deliberations because almost any juror “will disclaim the influence upon his own mind.” (Adams Laundry, 74 Misc at 533.)
Based on the facts of this case, a new trial is required. Mr. Greenspan’s conduct violated the sanctity of the jury, raises ground for suspicion that the decision was founded on something other than the evidence, and was prejudicial and likely to influence the verdict. This is not a matter of an isolated elevator conversation, cake for juror appreciation day or expressions of condolence. This is a case where jurors over a 15-day period believed that they were stalked, videotaped and closely monitored by a person they believed worked for defendants. This is a case where jurors performing their civic duty were made to feel bothered and scared. This is a case where the administration of the law was imperiled.
III. Conclusion
For the forgoing reasons, plaintiffs motion is granted, and a new trial is ordered. Counsel for plaintiff is directed to prepare an order consistent with this decision to be submitted to the court on notice within 10 days. The order shall attach a copy of this decision and incorporate it therein.